ROBERT W. BROOKE, AND MARY ANN HIS WIFE, AND OTHERS, *vs.* WILLIAM F. BERRY.—*Dec.* 1842.

A conveyance obtained by a general agent from his principal, will be vacated for fraud in its obtention ; or, because of the principal being a man of such feeble intellect, as to be incompetent to the management of his own business ; or in consequence of the terms being so unjust and unequal, as therefore to be unconscientious.

Exceptions to proof taken under a commission, will not avail the party making them, where the only tendency of the proof excepted to, is to establish facts admitted in the defendant's answer, or satisfactorily proved by other testimony which stands exempt from all objection.

A general exception to all the testimony taken under an *ex parte* commission, on the ground that it was vacated and set aside by an order of court rescinding an interlocutory decree, to let in a defendant's answer, cannot be sustained, when the proof was taken prior to the rescision of such decree.

The act of 1820, ch. 161, sec. 3, provides, that the filing of an answer, after an interlocutory decree is rescinded under that act, shall in no case affect the validity of any commission previously issued to take testimony, or the proceedings under it, or of any testimony previously taken and returned under any such commission : the efficacy of the proof is the same, whether previously or subsequently returned into court.

Notice of the execution of an *ex parte* commission, under the act of 1820, need not be given to the defendant He has no power, either to offer proof under such commission, or to cross-examine the complainant's witnesses.

Where a deed to a party is impeached as fraudulent, he cannot offer evidence of his good character and general upright conduct, in support of such deed.

The feeble intellect of a grantor ; the relation of principal and general agent between him and the grantee ; inadequacy of price for land conveyed by such a grantor to such a grantee ; are all circumstances calculated to impeach a deed, as constructively fraudulent.

Where there is great contrariety of evidence as to the feebleness of a grantor's intellect, as twelve witnesses for it and nine against it, the admission of his grantee, his general agent, that such grantor was incapable of transacting his own business, will corroborate the affirmative of that issue.

Such evidence is sufficient to control a defendant's answer, denying the fact of mental incapacity.

The effect of the averages of witnesses as to value of lands and rents, stated and discussed.

The value of land ascertained by considering its annual rents, as equal to five *per centum* on such value.

Gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion.

Agents are not permitted to deal validly with their principals in any case, except where there is the most entire good faith, and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage, or imposition.

Circumstances in the conduct, action and life of a grantor, stated and discussed, from which a court of equity will infer his mental imbecility, or, that undue influence had been exercised towards him by his general agent.

Where a general agent obtains from his principal a conveyance of lands at a price greatly below their value, this will, of itself, induce a court of equity to set aside the contract; unless it appeared to have been entered into, in a way and under circumstances, that there had been no abuse of confidence, no undue influence, no imposition, or material concealment practised by the agent on his principal, which could cast a shade of doubt as to the fairness and honesty of the transaction.

In valid contracts between principal and agent, the parties should meet on equal terms; and the agent is bound to protect the interest of his principal, with the same care and circumspection, that he would his own; if he does not thus deal with his principal, his contracts with him are tainted with suspicion, and will be set aside.

Where a court of equity vacated a conveyance of land from a principal to his general agent, on the ground of constructive fraud, and of which land the grantee had possession, and decreed a sale of the premises, it also decreed an account between the parties, in which the grantee was to be charged with the rents and profits of the land, and credited for his improvements thereon, during the time he held and enjoyed the lands, under his alleged purchase; and with all sums by him *bona fide* paid, on account of his principal, or which should be justly due and owing from him to his agent.

APPEAL from the Court of Chancery.

The bill in this cause was filed on the 27th January, 1841, by *Elisha Berry; Robert W. Brooke and Mary Ann*, his wfe; *Louisa, William, Nancy* and *Eliza Berry*, (the three last named being infants,) and alleged, that the said *E. B.*, who is the father of all the other complainants, except the said *R. W. B.*, being seized and possessed of considerable property and estates, both real and personal, lying, &c.; and being naturally of a feeble and weak mind and intellect, and therefore, incapable of managing the same with profit or advantage to himself and family, or to take care thereof, or to transact business generally with prudence, or even safety, was induced on or about the 7th May, 1836, by the artful persuasion and management of a certain *William F. Berry*, the defendant,

Brooke, et al. *vs.* Berry.—1844.

and who is the natural brother of the half blood of the said
*Elisha,* in whom he had the most unlimited confidence, and
who possessed the most unbounded influence over him, to
commit and entrust to him, the said *W. F. B.,* the sole and
exclusive charge, management and control, of all of the said
property; and made and constituted him the agent for the
transaction of all the business concerns of him, the said *E.,*
whatsoever. That in virtue of the confidence thus reposed in
him, and the authority and power so conferred on him by the
said *E.,* as his agent, the said *W. F. B.* continued to manage
and control the property of the said *E.,* as aforesaid, from the
period of time above stated, until about the 24th February,
1840; when the said *E.* having just grounds to apprehend
and believe that the said *W. F. B.* had greatly abused the
confidence he had reposed in him, and was seeking to enrich
himself at the expense of, and out of the substance and pro-
perty of the said *E.,* he determined to revoke the agency
which he had conferred on the said *W. F. B.,* as aforesaid,
and to withdraw the said property from his management and
control, which was accordingly done; that the numberless
impositions which before this time had been practiced upon,
and the advantages which had been taken of the said *E.,* in
relation to his said property, as well by the said *W. F. B.* as
by other persons, rendered it then but too apparent and evi-
dent, that the said property was altogether insecure, and
would be wholly lost to the said *E.* and his aforesaid children,
by the fraudulent and artful contrivances of any who might be
disposed to take the advantage of or deceive him, if the
said property were suffered to remain in a situation in which
it could be bound or affected by his acts or contracts. That
the said *E.,* himself, was finally convinced of this, and being
disposed and minded to provide for his said children, as also
to secure support for himself in after life, did, on or about the
24th February, 1840, execute and acknowledge in due form
of law, a certain deed or indenture in writing, whereby he
conveyed to the said *Robert W. Brooke,* who had before that
time intermarried with the said *Mary Ann,* one of the daugh-

ters of the said *E.*, all his property of every description what-
soever, in trust for the use of his said children ; and he the said
*E.*, to be well supported out of the same as long as he should
live.    All of which will more fully and at large appear, refer-
ence being had to an authenticated copy of the said deed,
which is herewith filed, marked A., as a part of this their bill
of complaint ; that soon after the execution of this deed, the
said *R. W. B.*, the trustee therein named, and the husband of
the said *M. A.*, the oldest child of the said *E.*, called on the
said *W. F. B.*, who, on his having been appointed by the said
*E.* as his agent, aforesaid, had taken possession of, and gone
to reside on an estate of the said *E.*, composed of the follow-
ing parcels of land, in the said deed specified, to wit: " *Chil-
leno Castle"* and " *Belfast*," or, "*Addition to Charles' Gift*,"
and " *John's Choice Diminished*," and continued to reside
thereon, at that time, and apprized him of the execution of
the said deed, and in virtue thereof, demanded of him, the said
*W. F. B.*, a surrender of the possession of the land of which
he had thus possessed himself; but this the said *W. F. B.*
refused to do, informing the said *R. W.* that he claimed a title
thereto in fee simple, by virtue of a deed of conveyance before
that time executed, by the said *E.* to him.    That thereupon,
the said *R. W.* communicated this to the said *E.*, who posi-
tively denied all knowledge of any such deed ; but, upon search
being made among the land record books of said county, it
was discovered, that such a deed had in point of fact been
executed by the said *E.*, on the 21st June, 1839 ; and the said
*Elisha Berry* avers, that the first intimation which he ever had
of the existence of this last mentioned deed, was from the
said *R. W.* in manner aforesaid ; that he never contracted or
agreed to sell or convey, any land to the said *W. F. B.*; never
received from him the consideration money, in the said deed
expressed and mentioned, or any other valuable consideration
for the said deed, but most solemnly asserts, that the said deed
was procured from him by the said *W. F. B.*, by fraud, decep-
tion, and misrepresentation ; and, as well as the said *E.* can
recollect, it must have been in the following manner :    That

about the time the said deed bears date, the said *W. F. B.* called on him, the said *E.*, when the latter too had not recovered from the effects of a violent attack of epilepsy which he had had then within a day or two before, and assured him that it was indispensably important, and for the interest of him, the said *E.*, that the sum of fifteen hundred, or two thousand dollars, should be raised immediately, for the use and benefit of his estates; that he, the said *W. F. B.*, could effect this very readily, if he, the said *E.*, would execute the paper which he, the said *W. F. B.* had had prepared, or would have prepared for that purpose. That if he would do so, his property would be relieved of some difficulties, and that the money which was to be raised on the paper, which he the said *E.* was required to sign, could be speedily returned to the lender, when the said paper would be returned to him, the said *W. F. B.*, who would certainly destroy or cancel it: and he, the said *E.*, should never again hear of it. That having the most unlimited confidence in the said *W. F. B.*, and in the truth of his said representation, and owing to the highly fiduciary relation in which the said *W. F. B.* at that time stood to him, the said *E.*, weak and feeble as he then was, consented to accompany him to *Upper Marlborough*, for the purpose aforesaid, which he could only accomplish, being carried thither in a carriage; and there, under the circumstances stated, executed a paper or instrument of writing, which he now believes to be the deed, a copy of which is herein before referred to, as exhibit B. The said *E.* avers, that the said deed was not read to him, or by him, prior to the execution thereof, and even if it had been it is extremely doubtful, whether in his then state both of body and mind, he should have been able to comprehend it, and that he executed it under a belief, that it was such a paper as the said *W. F. B.* represented it to be, and to raise money for his use. That although the land mentioned in and conveyed by this deed, is worth a much greater sum than the consideration money therein expressed, (four thousand dollars,) the said *W. F. B.* still is, (without the aid of the said land,) and always has

been, utterly unable to pay or raise so large a sum of money; that he was, indeed, at the time of the execution of this deed, in very indigent circumstances, and without even any employment or visible means of support, for himself and family, except what he might derive from the aforesaid agency, and the property of the said *E.*, which, in virtue thereof, was in his hands and under his management. That the said deed, so as aforesaid made and executed by the said *E.*, to the said *W. F. B.*, being, as they are advised and insist for the reasons stated, fraudulent and utterly void, your orators have by the said *R. W.*, as their trustee aforesaid, applied to the said *W. F. B.*, and requested him to deliver up and convey to the said *R. W.*, to be held by him for the purposes stated in the deed, hereinbefore first mentioned, and referred to as exhibit A, the land embraced in the said deed, from the said *E.* to to the said *W. F. B.* But now, so it is, may it please your honor, that the said *W. F. B.* combining, &c., and contriving how to wrong and injure your orators in the premises, he, the said *W.*, absolutely refuses to comply with the reasonable requests of your orators, pretending and asserting, that the said deed executed by the said *E.* to him, was for a fair *bona fide* and full consideration, and procured by no undue and fraudulent means on his part; whereas, your orators charge, that the said *W. F. B.* well knows, that the same was procured by the misrepresentation and deceit, hereinbefore stated, in gross violation of the confidence reposed in him by the said *E.*, and without the payment of a single dollar for the land therein embraced; all which actings, doings, refusals, and pretences, are contrary, &c.

Prayer, that the said *W. F. B.* may answer this bill, and that the said deed bearing date the 21st June, 1839, may be set aside and cancelled, by a decree of this court; and that an account may be taken of the rents, issues and profits, received by the said *W. F. B.*, from the lands embraced in the said deed, since the date thereof, and that he may be decreed to pay the same to the said *R. W. B.*, as trustee aforesaid. And that your orators may have such other and further relief in the

premises, as the nature and circumstances of this case may require, and to your honor seem meet, and for *subpœna,* &c.

With this bill the complainant filed various exhibits, as follows :

A. Indenture dated 24th February, 1840. *Elisha Berry* to *Robert W. Brooke,* for " *Good Luck,*" or " *Springfield ;*" for " *Provincial,*" "*Enclosure,* or *Enclosures,*" "*Fife Enlarged,*" " *Chilleno Castle,*" and " *Belfast,* or *Addition to Charles' Gift,*" " *Centreville,*" together with all his slaves that I have now in my possession ; all his household and kitchen furniture, farming utensils and plantation stock ; " all his interest in the estate of the late *Nancy Berry,*" in trust, &c.

B. Indenture of 21st June, 1839. *Elisha Berry* to *William F. Berry,* in consideration of $4000 ; for "*Chilleno Castle,*" 194 acres, 1 rood ; " *Belfast,*" or " *Addition to Charles' Gift,*" 37 acres ; *John's Choice Diminished,*" 11¾ acres : in fee, with a general warranty.

The defendant was summoned, and appeared, but not answering the bill, on the 19th July, 1841, an interlocutory decree was passed against him, and an *ex parte* commission was ordered and issued.

At the same term, July 1841, the defendant filed his petition praying, to set aside the interlocutory decree, and receive his answer ; which was ordered on the 2d September, 1841, and leave given to the defendant to file his answer.

The answer was then filed, and alleged, that prior to the filing of the bill of complaint, a bill was filed in the High Court of Chancery, by or in the name of *Elisha Berry,* one of the above named complainants against this defendant, which was answered by the defendant, and which he prays may be taken and considered as a part of his answer to this bill of complaint, so far as the same is applicable to the allegations therein contained. As this defendant's answer to the former bill, filed as aforesaid, in the name of *E. B.,* against him, gives a full and detailed account of the appointment of this defendant, as the agent of the said *E. B.,* and of the manner

12    v.2

in which said agency was conducted by him ; and the state of the account between him and the said *E. B.* ; of the termination of said agency, this defendant refers to his said answer, as his answer to the similar allegations in this bill of complaint. Further answering, this defendant says, that on the 9th December, 1836, he purchased of the complainant, *E. B.*, a tract of land called "*Chilleno Castle;*" also, one other parcel of land, called " *Belfast*," or, "*Addition to Charles' Gift ;*" and also, part of one other tract of land, called " *John's Choice Diminished ;*" and on the same day, to wit, the 9th day of December, 1836, the said *E. B.* executed to this defendant a bond of conveyance, for said lands, a copy of which is herewith filed, marked exhibit, No. 1 ; and is prayed, &c. That this defendant agreed to pay the said *E. B.*, for said lands, the sum of $3700, that being the sum which the said *E. B.* had given for said lands, some two or three years prior to the sale to this defendant. That on the 5th December, 1836, being four days prior to the execution of the said bond of conveyance, and the time at which this defendant first contracted for said lands, this defendant paid to the said *E. B.*, the sum of $2000, in part payment of said lands ; as will appear by a copy of the receipt for the same from the said *E. B.* to this defendant, herewith filed, marked exhibit, No. 2. This defendant further answering, says, that he has since paid the balance of the purchase money of said lands, in the manner and at the times specified, in an account herewith filed, marked No. 3 ; and that the said *E. B.*, in accordance with his bond of conveyance, on the 21st June, 1839, executed the deed, conveying said lands to the defendant, of which, the complainants' exhibit B, is admitted to be a correct copy. And this defendant here expressly alleges, that the said account, marked No. 3, exhibits a full, just, and fair state of the account, between him and the said *E. B.*, that said account contains all the credits, to which the said *E.* is in any manner whatever entitled ; and that the advances made by this defendant, as exhibited by said account, were made by this defendant, under, and by virtue of an understanding

had with the said *E. B.*, that this defendant should make said advances in payment of the balance of the purchase money of said lands. Further answering, this defendant says, that the said *E. B.* being unable to procure the relinquishment of dower by his wife, as he had by his aforesaid bond of conveyance contracted to do, did on the 21st June, 1839, the same day on which he executed said deed, execute to this defendant a bond, conditioned to indemnify this defendant from all claim of dower on the part of his said wife ; as will also appear by a copy of said bond, herewith filed, marked No. 4. This defendant further answering, says, that the allegation in said bill of complaint, that the said *E. B.* was induced by this defendant to execute said papers improperly or fraudulently, and when the said *E.* was in a weak and feeble state of health, and incapable of judging of their true import and meaning, is wholly untrue. This defendant, in answer to said allegations, says, that the said *E.* had not been sick for a long time prior to the execution of said papers, and that the said *E. B.* never had an epileptic fit, nor any other fit, until the marriage of his daughter with the complainant, *R. W. B.*, and until long after the execution of said papers. That the said *E. B.* was, on the day he executed said papers, in good health, and was through the whole day, entirely sober, and free from the influence of liquor. This defendant further says, that the said *E. B.* was, when sober, fully capable of guarding his own interest, and was as difficult to deal with, or get a bargain out of, as any man in the community. This defendant further says, that the sum which he contracted to pay, and has paid, for said land, was fully the value of the said land, at the time this defendant contracted to buy it ; that it was the same price which had been given for said lands some short time before by the said *E. B.* This defendant further says, that the complainant *E. B.*, has, since the filing of the said bill of complaint, departed this life, having previously, in due form of law, executed his last will and testament, appointing this defendant his sole executor, as will appear by a certified copy thereof, herewith filed, marked No. 5. That said will has

been admitted to probat, by the *Orphans' Court of Prince George's county.*  It will thus appear to your honor, that the complainants claiming  under a deed from the said *E. B.,* executed without any valuable consideration, are seeking in a court of equity to set aside a deed executed by the said *E. B.* for a full money consideration.

This defendant further answering, denies all, and all manner of fraud, deceit, imposition, or undue influence, with which he stands charged, in and by the said bill of complaint.  This respondent further says, that from the time he contracted for said lands, as herein before stated, he has been in the quiet, peaceable possession of the same, &c.

The defendant with his answer filed various exhibits, as follows, viz :

No. 1.  Bond of *E. B.* to *W. F. B.,* dated 9th December, 1836, to convey the land on which *W. F. B.* then resided, consisting of several named tracts.

No. 2.  Receipt.

"Received 5th December, 1836, of *William F. Berry,* $2000, for the property he, the said *W. F. B.,* now resides on, with appurtenances thereunto, which money is deposited in bank, to be checked for by the said *W. F. B.,* and applied to the payment of my debts.          E. BERRY."

"Witness, *E. D. Ferguson.*"

No. 3.  Account.  Dr. *E. B.* to *W. F. B.* Cr.

The account commenced 8th January, 1839, and concluded 20th May, 1840 ; including in its debits $175, for *W. F. B's* services as agent.   The debits amounted to $2289.68.   The credits, $378.95, for August, 1839; leaving *E. B.* in debt, $1910.13.

No. 4.  *E. B's* bond of indemnity, 21st June, 1839, to *W. F. B.,* against the dower right of *Deborah Berry,* in lands conveyed by deed of this date : penalty, $5000.

No. 5.  Will of *E. B.,* devising to *W. F. B.,* farm called "*Springfield* ;" 500 acres ; various negroes and farming utensils ; with devises to other children ; dated July, 1843, with probat.

Brooke, et al. *vs.* Berry.—1844.

Then followed the answer in chancery, sworn to on the 14th July, 1840, referred to in the answer in this cause, with the various exhibits originally filed therewith, viz:

No. 1. Sales of 4 hhds. of tobacco, 24th August, 1842, to *A. C. Casinove & Co.*, by *E. Berry.* Amount, $158.37.

No. 2. Account. *Elisha Perry* bought of *Elisha Berry*, 6th April, 1836, $158.98; settled by various credits to *E. P.*

No. 3. Sales of tobacco to *A. C. C. & Co.*, by *R. Wright;* $449.41. 6th November, 1838.

No. 4. Same as previous exhibit, No. 1. Bond of In-demnity.

No. 5. Indenture of 21st June, 1839. *E. B. to W. F. B.*: consideration, $4000. Conveying various tracts of land in *Prince George's* county, and all the estate of *E. B.* therein, in fee, with general warranty. Recorded 18th July, 1839.

No. 6. Bond of indemnity against dower, as before mentioned.

No. 7. Articles of agreement, under seal of 1st January, 1837. Between *E. B.* and *W. F. B.*, by which the former agreed to furnish the latter, with certain property, viz: eight slaves, two plough horses, two oxen, ploughs, carts, and other plantation utensils; all which is to remain with the said *W. F. B.* on the land where he now resides, for, and during the term of ten years, and pay him $150, annually; and the said *W. F. B.* on his part, agreed to pay *E. B.*, the one-half of the crops made by him, the said *W. F. B.*, for and during the said term, after deducting the expenses of making the said crops; and *W. F. B.* also agreed to superintend and look after all the said *E. B's* business.

No. 8. Acknowledgment of *E. B.*, that on settlement with *W. F. B.*, 8th January, 1839, he owed him $440.32.

No. 9. Account. Dr. *E. B.* to *W. F. B.* Cr. Debits between 8th January, 1839, (including above balance,) and 20th May 1840, of cash paid to various persons: for carriage horse, harness, bridge tolls, pork, beef, flour, store accounts, attorney's fees, and for services as agent, from 1st January, 1839, to 2nd March, 1840, in all $2889.08, and credits for

wheat made at *Springfield,* and cash received for rent and judgments, $378.95. Balance in favor of *W. F. B.,* $1910.13.

The complainants filed a general replication at Septem-tember term, 1841, and on the 22nd October, 1841, a com-mission to take proof, was issued by consent.

The *ex-parte* commission issued on the 19th July, 1841, was then returned, under which, various witnesses had been examined. That commission was closed on the 30th Sep-tember, 1841.

Another commission was issued on the 25th October, 1841, which was closed 21st February, 1843. Under these com-missions a great variety of evidence, documentary and other-wise, was taken, and returned into the court of chancery. This is sufficiently adverted to, in the opinion of this court.

On the 15th November, 1843, the death of the complainant, *Elisha Berry,* was suggested on the record.

The complainants excepted to the admissibility of portions of the proof, taken under the commission, which issued on the 25th October, 1841 ; and which was returned on the 28th February, 1843.

1st. To the answer of *Benjamin Duvall* to the defendant's third interrogatory : upon the ground, that evidence of the defendant's character, is irrelevent and inadmissible.

2nd. To the answers of *Enos D. Ferguson* and others, to the same interrogatory : upon the same ground.

3rd. To that portion of the answer of *Thomas G. Pratt,* to the defendant's fourteenth interrogatory : which speaks of the belief and impression of the witnesses.

4th. To the answer of *Jesse Talbot* to the defendant's eleventh interrogatory : upon the ground, that the declarations of the defendant to the witness, are not testimony in his favor.

5th. To the admissibility of the evidence of *Thomas F. Bowie.* 1st. Because he speaks of conversation with the defendant. And 2nd. Because he refers to the contents of paper writings, which are not shown to be out of the reach of the defendant, or lost or destroyed.

6th. To the answers of all the witnesses examined on the part of the defendant : because the interrogatories, to which those answers are responses, are all and each of them, leading interrogatories.

7th. To the answer of *Elisha Perry* to the defendant's nineteenth interrogatory : upon the ground, that the declarations of *Elisha Berry*, and more particularly his declarations after the execution of the deed to *Robert W. Brooke*, are not evidence against the complainants. And they also except to the depositions of all the witnesses of the same character.

8th. To the answer of *Enos D. Ferguson* to the defendant's tenth interrogatory : because the paper therein referred to, was not produced, or its absence accounted for.

The defendant excepts to the averments and allegations in the complainants bill, and to their sufficiency.

1. That there is no averment or allegation that the defendant committed a fraud upon his principal *E. B.*, in the purchase of the land in controversy, as agent or trustee.

2. That there is no averment or allegation, that the said purchase of the land in controversy, was made in breach and violation of the said defendant's duty and relation to the said *Elisha*, as agent or trustee.

3. That there is no averment or allegation, that the said purchase was made within the scope of the defendant's agency or trusteeship, or in the exercise of the power delegated to him by complainant, *E. B.*

4. That there is no averment or allegation in the bill, that the said defendant was authorised to sell the said land by the complainant, *E. B.*

The defendant also excepts to all proof taken by the complainants under both commissions; because, the interrogatories, each and all of them, are leading in answer to which the said proof is taken.

The defendant, also, excepts to the admissibility of all the complainants' proof, taken under the special and *ex parte* commission, that issued in this cause.

1st. Because all the interrogatories propounded to the witnesses, were leading interrogatories, particularly the 2nd, 3rd, 4th, 5th and 9th interrogatories, and the proof is there-fore inadmissible.

2nd. Because the said proof was obtained in reply to inter-rogatories, which were leading, and is therefore inadmissible.

3rd. Because the Chancellor by his order, passed on the 2nd September, 1841, cancelled and set aside the interlocu-tory order, under which the said proof was taken.

4th. Because all of said proof and testimony was taken, without any notice having been given to the defendant, or to his solicitors.

On the 27th November, 1843, the Chancellor (BLAND,) dismissed the bill with costs, being of opinion, that there was no sufficient evidence of the incompetency of the said *Elisha Berry* to contract, at the time of making the contract, which this suit seeks to have set aside, nor is there any sufficient proof of the said contract having been obtained by any fraud or mistake.

From which decree the complainants appealed to this court.

The cause was argued before ARCHER, DORSEY, CHAM-BERS, SPENCE, STONE and SEMMES, J.

By J. JOHNSON, for the appellants, and
By C. C. MAGRUDER and PRATT, for the appellees.

DORSEY, J., delivered the opinion of this court.

We do not think that the exceptions taken by the defen-dant to the averments in the bill of complaint can be of any avail to him; regarding the bill as sufficiently charging, if established by proof, that the defendant's title to the land in controversy was obtained by fraud; that if not obtained by fraud, it was acquired from *Elisha Berry*, a man of such fee-ble intellect as to be incompetent to the management of his own business, by *William F. Berry*, the defendant, his agent for the transaction of all his business, in whom he reposed entire confidence, under such circumstances of abused confi-

fidence or practised imposition, or under terms so unjust and unequal, as would affix to it the seal of condemnation, when brought to the view of a court of equity.

Neither can the defendant be benefitted by his exceptions to the proof taken under the commissions, issued for that purpose, because the only tendency of the proof, elicited under those portions of the complainants' interrogatories which are justly obnoxious to the exceptions taken to them, is to establish facts admitted in the defendant's answer, or satisfactorily proved by other testimony in the cause, which stands exempt from all objection. Nor is there any force in the defendant's exception to all the testimony returned under the *ex parte* commission on the ground that it was vacated and set aside by the Chancellor's order rescinding the interlocutory decree for the purpose of letting in the defendant's answer. The third section of the act of 1820, ch. 161, expressly providing that "the filing of such answer or answers shall in no case affect the validity of any commission previously issued to take testimony, or of the proceedings, or any of them, under such commission, or of any testimony previously taken and returned under any such commission." All the proof under the *ex parte* commission was taken prior to the rescission of the interlocutory decree on which it issued, and its efficacy is the same, whether previously, or subsequently returned.

There is no ground for the defendant's exception to the testimony under the *ex parte* commission, that it was taken without any notice having been given to the defendant or to his solicitor. No such notice was requisite. The defendant having no power of offering testimony before the commissioner, or of cross examining the witnesses produced on the part of the complainant.

The exceptions of the complainants to the testimony, on the part of the defendant, offered to prove the good character and upright conduct of *William F. Berry,* we think were well taken. Such evidence being inadmissible in this cause. As authority for which, *see note* 339 *of* 2 *Cowen's Phil. on Ev.* 456.

13      v.2

These preliminary questions being disposed of, we are brought to the consideration of the real merits of this controversy, as they appear upon the record before us.   The allegation of actual fraud, as charged in the bill, has not been proved, and was not insisted on in the argument for the appellants. But it is contended that the feebleness of the intellect of *Elisha Berry ;* the condition in which he stood in relation to the appellee, his agent for the transaction of all his business; the inadequacy of the price alleged to have been paid for the land conveyed, and all the circumstances surrounding the transaction, are of such a character, that they can receive no countenance from a court of equity; and that the deed complained of ought to be vacated.   And in this view of the case we entirely concur.   The agency of *William F. Berry* in the transaction of all the business of *Elisha Berry* is admitted by the answer and proved by not less than eight witnesses.   As to the feebleness of *Elisha Berry's* intellect and his incapacity to transact his own business, there is a great contrariety of evidence, twelve witnesses having deposed to the existence of such feebleness and incapacity and nine against it.   But the opinion of the twelve are corroborated by the declarations of *William F. Berry* himself, who, at different times, to three different individuals, whose testimony is before us, and to one of them on more occasions than one, stated that his brother *Elisha* was incapable of transacting his own business.   Looking then to this testimony only, and the number of witnesses testifying for each party upon the simple question of mental capacity, there would be perhaps a sufficiency of evidence, not only to control the positive denials in the answer, but also to entitle the appellants to the relief which they have sought. And when we connect this testimony with the relation in which the appellee stood to *Elisha Berry*, as his agent for the transaction of all his business, and with the fact that the land has been purchased greatly below its value, we cannot see how, consistently with the well established principles of equity, we can withhold relief from the appellants.   By averaging the valuations fixed, on the land in question, by the eighteen wit-

nesses who have deposed as to its value, instead of being sold, according to the alleged contract, for three thousand seven hundred dollars, six thousand five hundred and twenty dollars ought to have been paid for it. And this estimate of its value is strongly sustained by the nine witnesses who were examined as to what was a fair yearly rent for the land. By an average of their testimony the yearly rent would be $347.21; the capital to raise which, by an investment in land producing an interest of five per cent. (which is deemed a remunerating income from investments in land in the country,) would be $6,944. And fixing the rate of interest to be derived from such an investment at six per cent. per annum, would be $5,787.

The guards and limitations which a system of enlightened jurisprudence has cast around the dealings of principal and agent, have been so accurately defined by *Justice Story, in his 1st vol. of Commentaries on Equity,* 310, *section* 315, that we deem it, in this case, unnecessary to cite any other authority on the subject. After treating in the preceding section of the connexion between guardian and ward, trustee and *cestui que trust*, &c., and of what transactions between them shall stand: In the 315 section, in speaking of the relation of principal and agent, he says: "this is affected by the same considerations as the preceding, founded upon the same enlightened public policy. In all cases of this sort, the principal contracts for the aid and benefit of the skill and judgment of the agent, and the habitual confidence reposed in the latter, makes all his acts and statements possess a commanding influence over the former. Indeed, in such cases, the agent too often so entirely misleads the judgment of his principal, that, while he is seeking his own peculiar advantage, he seems, too often, but consulting the advantage and interests of his principal." "It is, therefore, for the common security of all mankind, that gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion. And indeed considering the abuses which may attend any dealings of this sort between principals and agents, a doubt has been expressed, whether it would not have been

wiser for the law in all cases to have prohibited them, since there must always be a conflict between duty and interest on such occasions. Be this as it may, it is very certain that agents are not permitted" "to deal validly with their principals in any cases, except where there is the most entire good faith, and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage, or imposition." If these principles of *Justice Story* be correct when applied to dealings between principal and agent, where the mind of the principal is exempt from all imputation of imbecility, what must be their influence when applied to a case like that, now before this court.

But in arriving at the conclusion we have formed in reference to the case before us, we are not compelled to rely solely on the oral testimony in the cause to convince us of the incapacity of *Elisha Berry* to transact his own business; of the excess of confidence reposed by him in the appellee, and the undue influence exerted over him by the latter. The acts of *Elisha Berry* and *William F. Berry*, as shown by the documentary evidence and oral testimony in relation thereto, irresistibly impel us to the opinion we have before expressed. *Elisha Berry*, it appears, has been in a state of wardship from the time of marriage till his death. If possessed of sufficient intellect to transact his own concerns, why should this have been? In 1829, *William F. Berry* for the first time became his agent for the transaction of all his business, and so continued until 1833, when he was superseded by *Richard H. Marshall* being appointed his successor. The first act of the administration of *William F. Berry*, which has been brought to our notice, is the obtaining from *Elisha Berry* the deed of the 21st of June 1831, for *Springfield* or *Good Luck*, containing upwards of five hundred acres of land (being his dwelling plantation) and ten negroes, all his household and kitchen furniture, plantation utensils and all the stock belonging to *Elisha Berry*, with a general warranty. Such a deed, for a merely nominal consideration, from a farmer, having a wife and children dependent on him for support, without any explanatory circum-

stances to sustain it, would bear, upon its face, internal evidence of mental imbecility in the grantor almost amounting to idiocy or lunacy; or that he had been the victim of undue influence; or been so overreached or imposed upon that the interposition of a court of equity, for his relief, would follow as a matter of course. And the presumptions against this deed are strongly fortified by the inconsistent conduct of the appellee, who, when superseded in his agency by the appointment of *Richard H. Marshall* in 1833 to a bill filed against him, in *Prince George's* county court, by *Elisha Berry* and *Richard H. Marshall* to set aside the said conveyance, though denying almost every allegation in the bill, insisted on the said conveyance as a fair and *bona fide* deed of gift from his brother *Elisha Berry*, voluntarily and freely made, and at his own instance and suggestion. Whilst to his solicitor he stated, notwithstanding the imputations cast upon him by the bill, that he had no design to keep the property against *Elisha Berry's* children, but only wished to prevent *Richard H. Marshall* from having any control over it. And yet, instead of going to his brother and having a full explanation upon the subject, and re-conveying the property to him, or some other person, other than the said *Richard H. Marshall*, we find the said *William F. Berry*, a few months after the filing of his answer, voluntarily reconveying the whole of the property, both real and personal, mentioned in the said alleged deed of gift, to *Richard H. Marshall*, in trust for *Elisha Berry* and his heirs. If this deed to *William F. Berry* was, as stated in his answer, a fair and *bona fide* deed of gift, made at the instance and suggestion of *Elisha Berry*, why was the property given by it suffered to remain in the hands of the donor from the date of the deed in 1831, till the filing of the bill for its recovery in 1833, without the slightest evidence, as far as the record discloses, of any demand of possession or assertion of title on the part of *William F. Berry* (then very poor according to all the proof,) to any portion of the property conveyed to him. As fraud is expressly denied by his answer, we can only account for his conduct by supposing him conscious of the mental imbecility of his brother, and of the invalidity of the conveyance executed in his favor.

In 1836, *Richard H. Marshall* having been dismissed from the service of *Elisha Berry,* he restored to his favor and confidence *William F. Berry,* and clothed him with his former plenary powers, as agent : who, as stated in his answer in the case now under consideration, purchased of his brother, in the beginning of the month of *December* of that year, two hundred and forty-two and a half acres of land, as is alleged, at its full value ; that is, $3,700.   For which, however, *Elisha Berry* had three years before paid $3,750, and had been offered for it by *Benjamin Duvall,* the person of whom, by his agent *Richard H. Marshall,* he had previously purchased it, the sum of $6,112.50, which offer had been rejected by *Elisha Berry.* Connecting this testimony of *Benjamin Duvall,* the appellee's witness, with the average value of the lands, as derived from all the witnesses sworn on that subject, it can hardly be insisted, that the appellee has not, in a contract with his principal, obtained a conveyance of his lands at a price greatly below their value.   Which of itself would induce a court of equity (apart from  the mental incapacity of the principal,) to set aside the contract, unless it were shown by competent testimony, that the contract was entered into in a way and under circumstances, which made it apparent, that there had been no abuse of confidence; no  undue influence; no imposition or material concealments practised by the agent upon the principal, which could cast a shade of doubt as to the fairness and honesty of the transaction.   In this case, the contract is supported by no such conservative testimony.   And, cast in the scale of objections to it, the reasonable doubt, if not the established fact, of the great mental imbecility of *Elisha Berry,* and this contract of 1836, cannot stand the scrutiny of a court of equity.

  If, as is alleged in the answer of the appellee, the land was designed to be sold to him for its full value, how can we, consistently with *Elisha Perry's* mental capacity for the transaction of business, his exemption from undue influence or imposition, account for his selling his land for $3,700, to his agent, when he had been offered for it $6,112.50, by another

person; and there is nothing in the record to induce a belief, that he could not still have obtained it? But if all other testimony were wanting on the subject, it is difficult to conceive how the written instruments exhibited by the appellee himself, to establish the contract of 1836, can be read without exciting the strongest suspicions, if not a confident belief, in the mental incapacity of *Elisha Berry* for the transaction of his own business; or that this contract of 1836, was obtained from him by an abuse of confidence, undue influence, or some objectionable means. The first of these instruments is *Elisha Berry's* receipt to *William F. Berry*, for $2,000 in advance, for the lands now in dispute, which money, the receipt states, is deposited in bank, to be checked out by *William F. Berry*, in payment of the debts of *Elisha Berry*. This sum of $2,000, one of the witnesses proves, was, about the 1st of December, 1836, deposited in his own name by *William F. Berry* in the *Bank of the Metropolis*. If *Elisha Berry* had been capable of transacting his own business, would he have been content that the receipt which he had signed, should be the only receipt signed in relation to this $2,000? Would he not have taken some receipt or written evidence from *William F. Berry*, that $2,000 had been placed in his hands, to be applied to the payment of *Elisha Berry's* debts. Suppose *William F. Berry* had been unfaithful to his trust, and applied the $2,000 to the payment of his own debts; or had denied its receipt, and refused to account for it in any way, what written evidence had *Elisha Berry* to show the accountability of his agent? None. Would a man of capacity to transact his own business thus deal with an agent, when placing thousands in his hands? If he would, it shows that he reposed a blind confidence in his agent, which should taint with suspicion all contracts, between them, for the purchase of the principal's property. The contracting parties do not meet on equal terms. Nor would an agent, discharging his duties with fidelity to his principal, and protecting, as he ought to do, the interests of his principal with the same care and circumspection that he would his own, thus deal with him.

The next written instrument relied on by the appellee, as showing the fairness of his title under the purchase from *Elisha Berry*, is the bond of conveyance of *Elisha Berry*, bearing date four days after his receipt for the $2,000, viz: on the 9th day of December, 1836. It is not pretended, on the contrary, the answer of the appellee disproves it, that when the bond of conveyance was executed, there had been any other payment made on account of the land, except the two thousand dollars. And yet, by the explicit terms of this bond of conveyance, without any condition as to the payment of the balance of the purchase money, or any thing else; and without the said *Elisha Berry's* receiving any bond, note, or written acknowledgment for such balance, he is bound in a penalty of ten thousand dollars, on or before the first day of November next, thereafter, to make a conveyance in fee simple, clear of all incumbrances, to *William F. Berry*. This bond of conveyance is virtually an acknowledgement that the whole purchase money had been paid; and in case of the death or infidelity of the appellee, *Elisha Berry*, as far as the record informs us, had not the semblance of evidence, on which he could rely, for the recovery of that portion of the purchase money remaining unpaid. Can it be believed, that a man capable of transacting his own business, would have placed himself in such a situation? It is no excuse for it to say, that this money was thus left in the hands of the agent, to be appropriated to the use of the principal, as occasion might require. No principal who knew what was due to himself, nor agent, who looked to the interest of his principal, would have assented to such an arrangement. It evinces a degree of mental incapacity, or unbounded confidence on the part of the principal, or undue influence by the agent, that *prima facie*, should infect and invalidate all contracts and transactions between them. There are other facts in reference to the written instruments, exhibited by the appellee, which, if weighed separately, would be esteemed of little import, but when viewed collectively and in connexion with the testimony and other facts of the case, tend to strengthen the views

hereinbefore expressed. The deed of 1831, though asserted to be a voluntary deed of gift, contains a general warranty; which is rather an unusual ingredient in such a conveyance. The bond of conveyance makes the penalty for its breach ten thousand dollars; and this bond is retained by the obligee, instead of being delivered up to the obligor, at the time of his executing the deed of conveyance. This deed states the pur·chase money paid for the land to be $4,000, instead of $3,700, as shown by the answer, and contains a covenant of general warranty, whilst at the time of its execution, *Elisha Berry* is made to execute a bond of indemnity, against the claim of dower, in the penalty of five thousand dollars. In these trans-actions between *William F. Berry* and *Elisha Berry*, it is impossible not to see, that whilst the rights and interests of the former were provided for, and protected by every guard which could be thrown around them, the rights and interests of the latter, were disregarded and abandoned, as it were, to take care of themselves.

In pursuance of the foregoing views, this court will sign a decree reversing with costs the decree of the Chancery Court; and remanding this cause thereto, that a decree may be there passed for the annulling and cancelling the said bond of conveyance, and bond of indemnity, and the two deeds of conveyance, from the said *Elisha Berry* to the said *William F. Berry*, which said deeds bear date on the 21st day of June, in the year 1839; and for the sale of the lands and premises therein mentioned; and for an account between the appellants and the appellee, in which the appellee shall be charged with the rents and profits of the said lands, and be credited for his improvements thereon, during the time he shall have held and enjoyed the said lands under his alleged purchase thereof; and shall be credited with all the sums of money by him *bona fide* paid, on account of the said *Elisha Berry*, or which shall be justly due and owing from him to the said *William F. Berry*. The sum of $2,000 depo-sited in the *Bank of the Metropolis*, and for which *Elisha Berry* gave a receipt, is not to be credited to him, the said

*William F. Berry*, until additional proof is offered, to shew that the same has been properly applied in discharge of the liabilities of the said *Elisha Berry*.

And this cause is furthermore remanded, that the chancellor may pass such further orders and decrees therein, as the nature of the case may require. The items in exhibit, No 3, of defendant, to be deemed by the auditor as established, except the first of said items, of $440.32, the balance on settlement.

DECREE REVERSED, AND CAUSE REMANDED.