JOSEPH T. BARRON, Administrator,

*vs.*

CATHERINE REARDON.

*Undue Influence—Evidence.*

On an issue as to whether gifts of savings bank deposits, made by decedent in her lifetime to a niece at whose home she lived, were obtained by the exercise of undue influence, *held* that, conceding the existence of confidential relations between decedent and such niece, the burden upon the latter of showing absence of undue influence was fully met. · p. 313

The influence of affection, attachment, or gratification, does not make a gift void, especially when it is but the execution of a long-cherished purpose. p. 313

*Decided January 11th, 1921.*

Appeal from the Circuit Court No. 2 of Baltimore City (DAWKINS, J.).

The cause was argued before BOYD, C. J., THOMAS, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Read H. McCaffrey,* for the appellant.

*William E. Hoffman,* for the appellee.

STOCKBRIDGE, J., delivered the opinion of the court.

This is the case of a bill filed by the administrator of Bridget Agnes Owens to have declared void, and set aside certain alleged gifts made in her lifetime, of deposits in savings banks, to Catherine Reardon.

The application is made for the benefit of certain nephews and nieces of Mrs. Owens, of whom there were seventeen, Mrs. Reardon being one of that number. The bill of complaint and the evidence bear both upon the mental capacity of the donor at the time when the gifts were made, and also is intended to show that the alleged gifts were procured by

Mrs. Reardon from her aunt as the result of undue influence exercised over her.

At the hearing in this court the counsel for the appellant practically abandoned all question as to the mental capacity of the donor, but rested his contention upon the question of undue influence, together with the proposition that the relations between Mrs. Owens and Mrs. Reardon were such as to make the doctrine of the confidential relations apply, and to place the burden of proof upon the defendant to show that the gifts of the money were the free, voluntary acts of Mrs. Owens, uninfluenced by those elements which would constitute undue influence.

It would serve no special purpose to recite in detail, or even fully abstract, the evidence of the various witnesses called upon by one side or the other, to support contentions of the opposing parties, and for the present purposes it will be sufficient to briefly summarize the leading features of the evidence, as far as the same can be gathered from the large mass of contradictory testimony which was offered.

The record is rather voluminous and much of that which was given in the way of testimony was clearly inadmissible and should have been excluded by the trial court. No motion was made at the conclusion of the testimony for the rejection of this incompetent evidence, and therefore, it has been necessary for the court to carefully examine all of the evidence adduced, and from such examination to form, as best it can, its conclusion as to the real facts of the case.

At the time of her death Mrs. Owens was about 85 years of age, or a little over. Her property consisted at the time of her husband's death, some eight years prior to her own demise in 1919, of a ground rent and deposits of various sums in a number of the savings banks of Baltimore City. The ground rent mentioned was sold by Mrs. Owens, so that at the time of her death the estate consisted solely, so far as she left any estate, of these various bank deposits. The conveyance of the ground rent, and her entire capacity to make it at the time she did, is nowhere called in question.

With regard to the amount deposited in the Metropolitan Savings Bank there does not seem to be any serious question. Between 1914 and the time of her death, this account had been decreased by withdrawals, so that the balance remaining on January 24th, 1919, was less than $200, and this account was finally closed by the payment by the bank, upon an order for $200, of the sum of $198.21, which was paid to the undertaker, and did not serve to discharge in full his bill.

After the death of Mrs. Owens' husband, for some three or four years she appears to have lived in different places, but in 1914 she went to live with her niece Mrs. Reardon, the defendant in this case. Subsequent to taking up this domicil, Mrs. Owens and Mrs. Reardon visited various of the savings banks, and there had the accounts, theretofore standing in the name of Bridget Agnes Owens, changed, and placed in their joint names and the survivor of them. This appears to have been done at the instance of Mrs. Owens.

The withdrawals made from the various banks by Mrs. Owens range in amount from fifteen dollars to one hundred dollars, and were wholly or partially used in the payment of her living expenses.

We then come to the point where the withdrawals were upon orders given upon one or another of these banks for the payment of the amounts named in such orders to Mrs. Reardon, and these orders were witnessed by a Mary A. Gavin. It seems from the testimony that what took place was that a considerable number of orders were signed at or about the same time, and all witnessed by Mrs. Gavin, though as matter of fact she did not see Mrs. Owens append her signature to them. The amount of the order, and the payee, and the date, appear to have been left blank, and subsequently filled in by Mrs. Reardon, and presented at the banks on which drawn, together with the book.

By these several withdrawals the amounts of Mrs. Owens' balances had become reduced to between four and five thou-

sand dollars, when there was presented to the several banks what is generally termed a "transfer order," under which the amounts then remaining on deposit were transferred to new accounts, made out in Mrs. Reardon's name. It is impossible to deduce from the testimony with any degree of certainty the exact point of time when these transfer orders were actually signed, but it is reasonably certain that they were at a time when Mrs. Owens was in full command of her faculties and perfectly competent to have given them.

It was as the result of these several orders that the entire moneys theretofore in Mrs. Owens' name are today claimed as a gift by Mrs. Reardon, and to set aside which this proceeding was instituted.

With regard to the physical and mental condition of Mrs. Owens, there arises the greatest conflict, varying all the way from an opinion expressed by a fifteen year old colored girl, employed as a domestic for a portion of each day in Mrs. Reardon's household, who says that for a year or more Mrs. Owens was in a stupor, incapable of executing a valid deed or contract, to that of the physician who attended Mrs. Owens during her last illness, and who testified to her mental alertness up to within three days of her death, which occurred on February 3rd, 1919.

A large number of the witnesses' testimony bears intrinsic evidence of being more or less influenced, unconsciously it may be, by their relationship to, or intimacy with, certain of the nephews and nieces, and it seems probable that this is what led the judge of the Circuit Court No. 2 of Baltimore City, in his opinion, to base his conclusion largely upon the testimony of the doctor, who was a thoroughly disinterested witness. Apparently Mrs. Anna Price, who had known Mrs. Owens for something like thirty-five years, occupied a not dissimilar position.

Some time before she was confined to her bed, Mrs. Owens had had a fall, the direct result of which was to produce a lameness in one of her knees, and lack of confidence in mov-

ing about. For something like eighteen months before her demise she had been practically confined to her room, and for the last six months to her bed. Some of the witnesses called on behalf of the plaintiff either used the term paralysis, or described a condition bordering thereon. That there was any paralysis was positively denied by Dr. Jones, and how much of the condition described by some of the witnesses as stupor, coma, unconsciousness, may have been either an indisposition to talk to the particular individual, or a more or less manifest failure of mental power, is somewhat difficult to decide.

There can be no doubt that, from the time when she was confined to her room, Mrs. Reardon did look after the business interests of her aunt, which business interests were practically limited to drawing the money from bank for her support. On the other hand, the alleged refusal of Mrs. Reardon to take callers, in some cases some of the nephews and nieces, upstairs to see Mrs. Owens, may have been the result, either of a desire to exercise an influence over the aunt, or equally well because in her physical condition she might at any particular time prefer not to have visitors. The conduct of Mrs. Reardon is as easily understood upon the one ground as upon the other.

It seems to be beyond question from the testimony, not of one but of a number of witnesses, that Mrs. Reardon was exceptionally cordial in receiving callers who came to her house to inquire with regard to the aunt, including a number of the nephews and nieces now directly interested, and that she carried this to an extent not to have been anticipated, if as matter of fact she was endeavoring to exercise any undue or improper influence over her aunt, for her own personal benefit.

The influence which is objectionable in the eye of the law is that influence which is fully discussed in *Todd* v. *Grove,* 33 Md. 188, and in *Williams* v. *Williams,* 63 Md. 371, and in numerous other cases. It is an influence which must be tantamount to force or fear, as this Court has often said.

While, on the other hand, there is the influence arising from an entirely different source, namely, the influence of affection, attachment or gratitude, which does not make a gift void, and the more especially when it is but the execution of a long cherished purpose. See *Eakle* v. *Reynolds,* 54 Md. 305; *Simpson* v. *League,* 110 Md. 286; *Reed* v. *Reed,* 101 Md. 138; *Chase* v. *Grey,* 134 Md. 619.

There is one phase of this case to which attention has not yet been directed. It is established, without serious contradiction, that for the last four and a half or five years of her life Mrs. Owens had made her home with Mrs. Reardon, who had provided for her and looked after her wants in many ways; that prior to her last illness Mrs. Owens had executed a will, by the terms of which, except for a few specific legacies, amounting all told to less then one thousand dollars, she had given her property to Mrs. Reardon; that few of her seventeen nieces and nephews ever called upon the old lady, or manifested any special concern with regard to her welfare, and, of these few, the visits paid were at intervals of from two weeks to a much longer period, and their duration at any one call was very brief.

The will which Mrs. Owens had executed was subsequently destroyed by her, because of articles which she read in the newspapers with regard to contests over wills, and she desired as far as possible to avoid her estate being involved in any such litigation, and she felt that the surest way to do this was by an act done by her in her lifetime, so that there should be nothing left to litigate over.

Bearing in mind the principles of the law applicable to the validity of gifts *inter vivos,* and granting that the relations established were those of a confidential nature, such as to throw the burden of proof upon the donee, this Court finds that the burden has been fully met, and that the decree appealed from should be affirmed.

*Decree affirmed, with costs.*