MAHALA J. GREEN ET AL. *v.* ELLA MICHAEL ET AL.

[No. 20, January Term, 1944.]

*Decided March 24, 1944.*

78

The cause was argued before DELAPLAINE, COLLINS, MARBURY, MELVIN, and BAILEY, JJ.

*Edward J. Ryan* and *William C. Walsh* for the appellant.

*Horace P. Whitworth* for the appellee.

COLLINS, J., delivered the opinion of the Court.

Ella Michael and Clementine Michael, administrators of the estate of Frank J. Custer and sisters of the deceased, filed in the Circuit Court for Allegany County a bill of complaint against Mahala J. Green and the First National Bank of Cumberland. This bill alleged among other things that Frank J. Custer, fifty-nine years of age at the time of his death, single, while feeble in health and impaired mentally and not capable of transacting business, in 1942 transferred to a joint account with Mahala J. Green $1,237.73 in the Second National Bank of Cumberland and $1,207.85 in the First National Bank of Cumberland; that the said Mahala J. Green had acquired domination over the said Frank J. Custer and his mental condition, together with his physical condition, rendered him susceptible to the influence and suggestions of Mahala J. Green so as to deprive him of his free agency; that he was induced to make the transfer of these accounts through the importunities, suggestions, demands and influence of the said Mahala J. Green. The complainants asked that the sum of $1,237.33, formerly in the Second National Bank of Cumberland, be declared to be the sole property of the estate of Frank J. Custer and that Mahala Green be declared to hold the same in trust for the benefit of his estate and be ordered to pay the same over to the plaintiffs; that the deposit of

$1,207.85 in the First National Bank of Cumberland be declared the property of the said Frank J. Custer and that the defendants be enjoined and restrained from withdrawing said fund pending the determination of the suit. After answer filed denying the material allegations of the bill, testimony was taken in open court. The chancellor granted the relief prayed and ordered Mahala J. Green to pay the costs. An appeal is taken to this court by Mahala J. Green from that decree.

On appeal all contention that Frank J. Custer was *non compos mentis* or mentally incapable of executing a valid deed or contract is abandoned, and the only question before this court is whether Mahala J. Green exercised undue influence over Frank J. Custer and by fraud procured the assignment of the bank deposits. There is no contention that the joint accounts were not worded in such form as to go to Mahala J. Green upon the death of Custer.

In a case of this kind, it is necessary for a proper understanding thereof to detail the testimony by which it is sought to establish undue influence. The mother of Frank J. Custer, Ella Michael and Clementine Michael, previous to her death twelve years before that of Frank J. Custer, lived on a farm in Garrett County which she inherited from her husband. Frank J. Custer, being a bachelor, lived with her, and before her death she turned over to him the farm and all her personal property. The appellees alleged that the sum turned over to Mahala J. Green by him, now in dispute, was part of the funds which came from their father and mother. After his mother's death, Custer lived alone on the farm, doing very little farming and doing his own cooking and housekeeping, providing very little food and at times almost starving himself to death. During the last seven or eight years of his life, the deceased suffered with a deficiency in the blood and anemia caused by malnutrition through lack of proper food. His sisters, Ella Michael and Clementine Michael, lived within a few miles of his farm. Six or seven years before his death,

Frank J. Custer lived with his sister, Clementine, once for a period of five or six weeks and stayed with her for a short time three or four years before his death. He never stayed with his sister, Ella Michael, although invited to do so. His sister, Ella Michael, had not seen him for six months or a year before his death, and Clementine Michael had not talked to him for three years before his death, except one night when she saw him going to the home of Mrs. Green. From the record, although it appears that his sisters were willing to help him and invited him to their homes to care for him, Frank had no affection for them. They knew that he was in bad health, and if he had come to them for assistance, they would have looked after him, yet they made no effort to keep in touch with him and to determine his condition although they knew that he was not in good health. None of his other relatives did much for him.

Mahala J. Green at the time of Custer's death was a widow seventy-four years of age and had eight children. Her husband had been dead about ten years. She formerly lived on a farm near Frank Custer and later moved to Moscow, a town about four miles from Frank's home, six years before his death. Although acquainted with her for a period of ten or fifteen years, he first came to her house seven years before his death to sell her eggs. He became greatly attached to her and according to her statement, regarded her as a mother. After that time he spent most of his time at her home where he slept and where she cooked for him, washed his clothes, sewed and took care of him generally. He would stay sometimes for a week and sometimes for two weeks and then go home for two or three days. During this period he was sick a great deal of the time. She nursed him and gave him medicine. He spent the last three weeks of his life at her home, she taking him to the hospital three or four days before he died. He paid her nothing for his board, room, lodging, sewing, washing and nursing care. However, she kept a record of the days

which he spent at her house and with his knowledge, charged him in a book at the rate fo $1 a day for 574 days. This apparently was regarded as a charge for board but not for care, nursing, washing, sewing and other general services rendered. He never paid this account, but told her to file it against his estate when he died, which she later did, as he would still have the farm and it was good for the bill. She said that he wanted to turn over all his money to her and also deed her the farm but that she would not consent to this, and also that he wanted her to marry him, which she would not do. On January 28, 1942, he went to Cumberland with Mrs. Green on the bus. She said that she was going to see a doctor and he asked to go along and she told him, "Yes, sure, the road is open." After stopping at her daughter's house, the three of them went to the Second National Bank in Cumberland. Mrs. Green and her daughter stayed in the background, and Custer went up to a teller's window and according to the testimony of that teller, wanted to know about changing his account. The teller explained to him the several forms of joint accounts and the effect of these, and the teller said that he appeared to understand what he was doing and said that he wanted to put the account in his name and Mrs. Green's name so that either could draw the money at the death of the other. The three then went to the First National Bank of Cumberland and he was waited on by Miss Hazel Oder. She stated that he came in and said he wished to add a name to his account. She explained to him the various forms of joint accounts and the effect of these, and said that he appeared to understand what was being done; that Mrs. Green was there, but she had nothing at all to do with opening the account. Miss Oder talked to Custer at her desk. Mrs. Green was there but she does not remember just where. At both banks Mrs. Green signed a signature card. Mrs. Green said that two days after they returned home, he said, "I am glad this was over; I am glad of it—you are a mother to me." "I said, 'How about the board bill?'

'Put it against the estate; you know my place will fetch it.' 'I know it, but I don't want to have no trouble'." On a later occasion Frank and Mrs. Green went to the bank at Frostburg, where he wanted to also change his funds to a joint account with Mrs. Green. An objection was raised by the bank officials and a suggestion made that rather than change the account, he make a will. Mrs. Green objected to a will because it could be broken and so did Frank. They both quarrelled with the bank officials, became angry and left the bank, and no transfer was ever made of that account which is now part of his estate. He never got out of her house after that time except to go to the hospital where he died.

Mrs. Green testified that after he left to go to the hospital that last time, she found the bank books under the pillow. After Frank's death Mrs. Green told his sisters about these joint accounts. Six days after his death she went to the Second National Bank and obtained the money in the account there, but was unable to get the money at the First National Bank as that institution had been advised not to turn the money over to her.

Through the testimony of other witnesses, it is established that Frank J. Custer was a most penurious man and was described by one of his neighbors as "tight as the bark on a tree." His attending physician in whose clinic he died stated that he had been treating him for four or five years; that when he would come to see him, "he would jew me down on the price of his call" and always paid cash and wanted a receipt every time. Other than that he saw nothing abnormal or peculiar about him. Before he went to the bank to have the interest put on his book, he, with the help of Mrs. Green, would figure the interest in order to check on the bank. His education was limited to the fifth grade in school.

Great stress is placed by the appellees on the fact that this money originally came from their father and mother although this is not proved. Regardless of where the money came from, it belonged to Frank J. Custer. If

the relatives claimed this as theirs because it came from the father and mother, they should have taken some action at the time he received it. This case in no way involves the manner by which he acquired the money. It was absolutely his to be disposed of as he wished. During a period of six or seven years before his death, he received nursing care, a home and the ordinary comforts of life for which he paid not one penny. Apparently he did not care what became of his property after his death other than to take care of Mrs. Green. He had no affection for his relatives as is clearly demonstrated, although they would have cared for him. They knew he was in bad health, but they made no effort to check on his condition. The amount of the estate left by him, disregarding the amount turned over to Mrs. Green, including the farm which has since been sold, is $6,100. The amount to be received by Mrs. Green from the joint accounts turned over during his lifetime is $2,445.58. Great stress is put upon the statement made by Mrs. Green on cross-examination that he consulted her about his business transactions; that she never knew him to do anything that she told him not to do and he would do what she told him to do. Also the fact that she at one time objected to his lending one of his nephews money is stressed. However, evidence that he did not always do what Mrs. Green wanted him to do is produced by Clementine Michael, who testified that Frank told her that Mrs. Green wanted him to deed her the farm but that he would not do it. Clementine Michael talked to him about his money and she testified: "He just said it was his'n and he could do as he wanted with it; of course, it was." If Frank J. Custer had outlived Mrs. Green who was fifteen years his senior, certainly she would have received nothing for her services to Frank Custer, and it is doubtful whether her estate would have received anything. It appears that Custer, following the other penurious practices during his life, obtained board and good care for many years without paying for it. It is apparent that he cared very little

for his relatives and was not interested in who received his property after his death other than that Mrs. Green should be paid and rewarded from his property after he had no further use for it.

Appellees contend that a confidential relationship existed between Frank Custer and the appellant and that as between the two, she was by far the stronger character. Chief Judge Bond said in the case of *Snyder v. Hammer*, unreported in 180 Md. 690, reported in full in 23 A. 2d 653, 655, in speaking of confidential relationships: "To establish such a relationship there must appear at least a condition from which dependence of the grantor may be found." Frank Custer was not dependent upon Mrs. Green. He had the choice of living with and being cared for either by his sisters or by Mrs. Green and he selected the latter. Likewise, he had the choice of either providing that his money go to his relatives or to Mrs. Green. Making his selection is not evidence of his dependency. In general a confidential relationship may be presumed whenever two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other. 12 *Corpus Juris, Confidential Relations*, p. 420; 15 *C. J. S., Confidential Relations*, p. 821; *Chase v. Grey*, 134 Md. 619, 623, 107 A. 537; *Gaver v. Gaver*, 176 Md. 171, 186, 4 A. 2d 132. This court held in the case of *Todd v. Grove*, 33 Md. 188, 191, leading case on this question, that where agency extended to the transaction of all the business and management of all the affairs of the principal and this being so a gift was obtained, that a confidential relationship existed. *Brooke v. Berry*, 2 Gill 83; *Brown v. Mercantile Trust & Deposit Co.*, 87 Md. 377, 390, 40 A. 256. Where a confidential relationship exists, a gift is *prima facie* void, and the burden is on the donee to establish to the full satisfaction of the court that it was the free, voluntary and unbiased act of the donor. *Brooke v. Berry, supra; Highberger v. Stiffler*, 21 Md. 338, 83 Am. Dec. 593; *Todd v. Grove, supra; Pairo v. Vickery*, 37 Md.

467; *Cherbonnier v. Evitts,* 56 Md. 276; *Williams v. Williams,* 63 Md. 371, 405; *Whitridge v. Whitridge,* 76 Md. 54, 73, 24 A. 645; *Zimmerman v. Bitner,* 79 Md. 115, 125, 28 A. 820; *Horner v. Bell,* 102 Md. 435, 62 A. 736; *Hammersley v. Bell,* 134 Md. 172, 106 A. 339; *Coburn v. Shilling,* 138 Md. 177, 199, 113 A. 761; *Gerson v. Gerson,* 179 Md. 171, 177, 20 A. 2d 567. It was said by this court in the case of *Barron v. Reardon,* 137 Md. 308, at pages 312 and 313, 113 A. 283, at page 285: "The influence which is objectionable in the eye of the law is that influence which is fully discussed in *Todd v. Grove,* 33 Md. 188, 202, and in *Williams v. Williams,* 63 Md. 371, and in numerous other cases. It is an influence which must be tantamount to force or fear, as this court has often said. While, on the other hand, there is the influence arising from an entirely different source, namely, the influence of affection, attachment, or gratitude, which does make a gift void, and the more especially when it is but the execution of a long-cherished purpose. See *Eakle v. Reynolds,* 54 Md. 305; *Simpson v. League,* 110 Md. 286; *Reed v. Reed,* 101 Md. 138; *Chase v. Grey,* 134 Md. 619." Where a confidential relationship exists, the courts will not allow a transaction between the parties to stand unless there is a full and fair explanation of the whole transaction. *Zimmerman v. Bitner, supra,* 79 Md. 126, 28 A. 820. Generally, a man may dispose of his property as he wishes, and he is under no obligation to assign a reason for his conduct. Where there is volition and intelligence, it is wholly immaterial what motive prompted or induced the act. When, however, the reason assigned is so flagrant and unjust as to suggest that it was not voluntary or the act of a capable mind, then the reason is open to examination as to whether it was a voluntary act. *Frush v. Green,* 86 Md. 494, 507, 508, 39 A. 863. The transfer to Mrs. Green should not be held to be flagrantly unjust. A person, in order to show his gratitude for a comfortable existence, is, of course, allowed in the disposal of his property to show his gratitude toward that

person by a gift of property. *Zimmerman v. Frushour*, 108 Md. 125, 126, 127, 69 A. 796. Frank Custer was not of unsound mind, was close on a business deal and looked after every penny of his money. We have only to inquire whether he was unduly influenced in making the gifts in controversy. We see nothing in this case to show that any advantage was taken of Frank Custer by Mrs. Green. There is nothing to show that he was coerced into doing anything that he did not want to do. The gift to her appears to be a recognition by him of the kindness and care given him. Even if such care were given by her with the idea that she would be rewarded, she is simply being paid for those services to the extent to which the donor thought she was entitled. If a man disposes of his estate in the free exercise of his own free will and judgment, the court is not authorized to nullify his gift because of the judicial belief that he may have been too generous or that he disregarded consideration of kinship which should justly have been recognized. *Saxton v. Krumm*, 107 Md. 393, 68 A. 1056; *Simpson v. League*, 110 Md. 286, 293, 72 A. 1109; *Reil v. Wempe*, 145 Md. 448, 125 A. 738. Unless the transfer made by one mentally competent was induced by influence or fraud directly practiced upon the donor, the courts will not disturb the gift even though it may violate the standards of relationship of those whose expectations may be so frustrated. *Saxton v. Krumm, supra; Simpson v. League, supra; Combs v. Scharf*, 143 Md. 70, 121 A. 857; *Griffith v. Benzinger*, 144 Md. 575, 125 A. 512; *Reil v. Wempe, supra; Malone v. Malone*, 148 Md. 200, 129 A. 10; *Birchett v. Smith*, 150 Md. 369, 379, 133 A. 117; *Zimmerman v. Hull*, 155 Md. 230, 141 A. 531; *Messick v. Pennell*, 182 Md. 531, 35 A. 2d 143. Such disposition may be harsh and cruel and as a result relatives deprived of that to which the court may think them morally entitled. If such gift was the free and voluntary act of the donor, the courts are helpless to interfere. In this case it is not shown that the gifts made by the deceased to the appellant were

obtained by undue influence. It appears that the appellant has made ample and full explanation as to why these gifts were made and even if a confidential relationship existed between the parties, which we do not think is established in this case, the appellant has met the burden to establish the *bona fides* of the transactions, and therefore the bill of complaint should be dismissed.

> *Decree reversed, with costs to the appellant above and below, and bill dismissed.*