BERNARD KERBY, JOSEPH KERBY, and others *vs.* JAMES P. KERBY and JOHN B. KERBY.

*Deed from Principal to Agent—Confidential Relations— Undue Influence—Mental and Physical Infirmity—Consideration of Deed—Admissibility of Evidence.*

J. P. K. was the general agent on the farm of C. E., his mother, from 1853 to 1872, when C. E. died. C. E. owned a farm of 317 acres. On 4th Feb., 1864, C. E. executed a deed to J. P. K., for 75 acres, including the dwelling; and for a ten acre wood lot. The recital and consideration of the deed were as follows: "whereas J. P. K. has, for many years, taken care of his own mother, C. E., surrounding her with every possible comfort, and the said J. P. K. has for so many years taken care of and improved the real and personal estate of the said C. E., at her entire pleasure and satisfaction. Now this indenture witnesseth: that the said C. E. in consideration of the above recited premises and also of the solemn promise made by the said J. P. K., of allowing his brother, J. B. K., the privilege of a home in the dwelling at Hart Park during his single life, and also in consideration of the said J. P. K. having given up any claim to any portion of real estate she may leave at her death, has granted," &c. On bill filed by the heirs-at-law of C. E., to set aside this deed, alleging it to have been procured by the fraud, undue influence and persuasion of J. P. K., as general agent of C. E., when C. E. was old and infirm in body and mind, and unable to make or understand the instrument; and alleging that after discovering the deed had been procured from her, the said C. E. in her life-time filed a bill to set it aside, which bill was dismissed by an order from her, procured in like manner with the deed- HELD:

1st. That J. P. K. being general agent of C. E., the deed to him was *prima facie*, tainted with fraud and undue influence.

2nd. That the services of J. P. K. and minor son on the farm, not otherwise compensated, formed sufficient consideration for the recital and consideration of the deed, provided, the amount and mode of compensation were not the result of undue influence.

Kerby, *et al. vs.* Kerby and Kerby.

3rd. That on the proof the deed must be sustained as fair and good.

4th. That J. B. K. a beneficiary under the deed was not incompetent under the act of 1864, ch. 109, to testify.

5th. That non-experts must state grounds and facts sufficient to justify the expression of an opinion, and the reasons for it, respecting mental capacity.

6th. That persons in the service of one alleged to be infirm in mind, and frequently or constantly about such person, and having business dealings together, are competent to express an opinion respecting the mental condition of such person.

7th. That the dismissal of bill to set aside deed, after full knowledge of the facts from independent counsel, an attorney who instituted the proceeding, was a re-adoption of the deed; and the deed then stood as if originally executed after independent advice; provided the dismissal itself was not fraudulently procured.

8th. Objections to questions as leading must be made before commissioner, when propounded.

9th. Declarations of a grantor cannot be admitted to impeach his deed, while his declarations in support of it are admissible as against himself or those claiming under him.

APPEAL from the Circuit Court for Prince George's County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY, ROBINSON and IRVING, J.

*C. C. Magruder, Jr.,* and *Wm. H. Tuck,* for the appellants.

*Joseph K. Roberts, Jr.,* for the appellees.

IRVING, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Prince George's County, refusing to set aside a deed from Christiana Edelen, to her son James P. Kerby, dated

the 4th day of February, 1864. The bill seeks a partition of the real estate of Mrs. Edelen by means of a sale, because of its indivisibility otherwise. It also asks for a decree setting aside the deed from Mrs. Edelen, to her son James P. Kerby, that the land thereby conveyed may be sold with the rest of the intestate's estate. It also prays for an account of the rents and profits of the estate, from James P. Kerby. The Court decreed the sale of the real estate, except seventy-five acres conveyed by the deed to James P. Kerby, which deed the Court upheld, except as to ten acres of wood land, which the Court deemed insufficiently described. The Court also refused to call James P. Kerby to an account for the rents and profits of the land. No formal objection has been made to the bill for multifariousness, though it was adverted to in argument, and we are not to be regarded as expressing any opinion upon the bill in that respect.

In substance, the bill charges that Mrs. Edelen was possessed of a large real and personal estate ; and that, on the 4th of February, 1864, when she was seventy-two years old, with mental and physical faculties so much impaired, by age and disease, as to be unable to attend to her business, and unable to understand the nature and contents of such an instrument, James P. Kerby by undue influence and fraud procured the deed in question from her. It charges that he lived with his mother and attended to all her business, from 1854 to her death ; and that he received all the proceeds of the crops and never accounted for the same ; but appropriated the same to his own use ; and that the average annual profits of the estate, above expenses, amounted to over one thousand dollars. It charges that the deed was without consideration, and that the considerations set out in the deed were pretended and false ; that the deed was not her voluntary act, and that when a copy of it was shown to her, in January, 1868, she denounced it as a fraud practiced upon her ; and

immediately caused a bill to be filed to set it aside. A copy of this bill is filed as an exhibit, and it is alleged that this bill was afterwards dismissed by an order of Mrs. Edelen, which they say was not signed by her, or if it was, was not her voluntary act; but was procured by James P. Kerby's overruling influence over his mother. It is alleged that the land embraced in the deed was more than the fair share of the grantee in the land of his mother, and was the most valuable part of the estate and included all the buildings. The preamble to the deed and the statement of consideration are in these words: "Whereas the said James P. Kerby has for many years taken care of his own mother, said Christiana Edelen, surrounding her with every possible comfort, and the said James P. Kerby has for so many years taken care of and improved the real and personal estate of the said Christiana Edelen at her entire pleasure and satisfaction: Now this indenture witnesseth, that the said Christiana Edelen in consideration of the above recited premises, and also of the solemn promise and obligation made by the said James P. Kerby of allowing his brother, John B. Kerby the privilege of having a home in the dwelling, at Hart Park, during his single life, and also in consideration of the said James P. Kerby, having resigned and given up any claim to any portion of real estate she should leave at her death, has granted, bargained and sold, &c."

The appellee, Dr. John B. Kerby, answered, alleging ignorance touching the circumstances attending the execution of the deed; but that his mother had told him James would be getting no more than he deserved, and insists that if the deed was sustained, that the charge in favor of himself must be carried out, and claiming his portion of the balance of the estate.

The appellee, James P. Kerby, answered in full, denying all the allegations made by way of impeaching the deed, and insisting on its entire fairness, and the true,

voluntary and uninfluenced act of his mother.  He denies that his mother had suffered from a long and severe illness, and that her mind was impaired, and her physical system was so impaired, as to render her incapable of attending to business; and unable to understand or read the contents of the deed; and that the deed was procured by his importunity.  He avers the deed was prepared when he was not present, by a certain Gustavus Finotti, who did so on instruction and directions received from her personally; and was executed by her freely and voluntarily, and with full knowledge of its contents, and without any undue influence or persuasion of any kind on his part.  He denies that the considerations set for thin the deed are pretended, or false in fact, or suggested by him.  He came, he avers, to his mother, at her request in 1854, when he admits he owned no property; but not because he could not support himself and his children.  He admits that he acted as general agent for his mother; and says but for his care and attention, being already in debt when he came, she would have been hopelessly involved in debt.  He denies that his children all came with him; on the contrary, he avers that his daughters did not come to his mother's until 1861; and that his son Charles worked on the farm without compensation until his arrival at the age of twenty-one.  He avers also that he received no compensation for his labor and services.  He denies that he took possession of all the proceeds of the crops and never accounted for the same.  On the contrary, he alleges that his mother directed the whole disposition of the proceeds, and they were paid over to her.  He denies that the annual income of the farm, exclusive of expenses exceeded one thousand dollars; and alleges that for some years prior to his mother's death, the farm little more than paid expenses.  He denies that since his mother's death, he has been in possession of any but his own land: and that there are any proceeds not accounted for in his administration accounts upon the estate of his mother.

By the admissions of the appellee, James P. Kerby, it is clear that he stood in that attitude and relation to Mrs. Edelen, as her general agent, which requires this deed from her to him to be scrutinized most closely, and with suspicion. It is immaterial whether it is to be regarded as a gift or as a deed for valuable services rendered; the relation he bore to her, was one of such confidence and trust, that the law regards the deed as *prima facie,* tainted with undue influence and fraud; and throws on the grantor the *onus* of showing it to be the free and uninfluenced act of the grantor, upon full knowledge of all the circumstances connected with it and of its contents. The law controlling such a case is so fully discussed, and clearly laid down in the case of *Brooke vs. Berry,* 2 *Gill,* 83, and in *Todd vs. Grove,* 33 *Md.,* 188, it is unnecessary to do more than refer to those cases, for the rule to which this grantee is subject; now that the validity of his deed is assailed. Notwithstanding the suspicious attaching to the transaction by reason of the relations of the parties to each other, as principal and agent; we think, upon a careful sifting of the proof, that the deed ought to be supported, and upheld as consonant with fair dealing, and the principles of equity.

1. It appears from the proof, that James P. Kerby came to his mother's house in 1853 or 1854 at her request. Upon the suggestion of his brother, Dr. John Kerby, who lived with her all his life, except while he was at school. Dr. Kerby was unable to attend to the farm, and proposed to his mother to send for James. He came, and from that day to the day of her death he managed the farm, and attended to her business generally, except so much of it as the evidence shows she attended to in person. The farm was managed skilfully; this the witnesses all say; and by the declarations of Mrs. Edelen, which are admissible against her, and those claiming under her, in support of the deed, it was so managed that her

debts were paid off, and to her entire satisfaction. Indeed, it appears in the proof, that she declared him to be a most faithful, dutiful and industrious son. Beyond the support he received, he is not shown to have received any direct compensation for his services. They are variously estimated, in money value, from two hundred and fifty dollars to six hundred dollars per annum, in addition to board. Besides the services of James P. Kerby, his son Charles, during his minority, worked five years as an ordinary farm hand, without compensation. His father was entitled to his service, and disinterested testimony from a laboring man fixed the value of Charles' labor at $150 per annum, with board. The daughter Kate from the time she came in 1861, worked for her grandmother as housekeeper, and her services are proven to have been worth considerable. He and his children therefore were not a burden, but rendered active service. There seems to have been reasonable ground for the recitals in the deed, " that James had for many years taken care of his mother, and surrounded her with every possible comfort, and for so many years had taken care of and improved the real and personal estate." The services of James P. Kerby and of his children, to whose labor he was then entitled, in and about the farm and business of his mother, to which manifest reference is made in the recitals and consideration of the deed, would form a *valuable* consideration to support the deed ; provided this mode and amount of compensation were not secured by undue advantage taken of his position and influence.

2. In view of all the facts of the case, the proportion of land conveyed was not disproportionate and unconscionable, and properly considered, is not even a suspicious circumstance. When we consider the condition annexed, that he should abandon all further claim on the estate, she might die possessed of, and the fact that it was charged with a home for his brother, it was a very mode-

rate allowance to him, over and above his natural share, in equal division; if we assume, that the services were rendered to the satisfaction of the grantor, and that she, of her own accord, designed to compensate him in this way. According to Mr. Sheriff, who lived on the land, and worked a part of it for Mrs. Edelen ; who was familiar with it, and disinterested, the whole farm was worth about nine thousand dollars. Of the acreage, (the farm containing 317 acres,) James P. Kerby took by the deed, a little more than one-fourth. In value, according to Mr. Sheriff's estimates, his deed gave him about one-third, or three thousand dollars. By the lowest estimate put on the services rendered, the services of the father for eleven years, up to the date of the deed, and of the son for three years preceding the deed, would together have amounted to thirty-two hundred dollars; which is more than the value of the land conveyed. Upon an equal division, on the same estimate of value, James P. Kerby would have been entitled to nearly thirteen hundred dollars. It is apparent, therefore, that considering the value of his interest in equal division, and considering the incumbrance of a home for Dr. Kerby, which was superadded, the recognition of his services did not amount to one-half the amount, which the lowest estimate up to date of deed would have made it. When we consider, in addition, that the same kind of service was evidently contemplated as to continue during the mother's life, and was actually rendered for eight years afterward, till her death in 1872, the idea, that the deed was the result of the *fraudulent* exercise of undue influence or improper use of his position, as agent, to secure the deed, is almost excluded. It would seem that his demand was moderate and fair; or, that if it was otherwise, the mother was strong-willed enough to resist and bring it down to her view of what was right. This is the natural inference upon full consideration of the facts touching the value of the land.

3. It is abundantly clear that the grantor fully recognized the value of the labor of her son, and what was done for her by him, and intended in that way to remunerate him. She so stated to Finotti, the draftsman of the deed, when she was giving him instructions for its preparation. She then said, out of her son's presence, when no one was present but Finotti, that there could not be a more faithful, industrious and dutiful son, than he was. To Joshua Sheriff, she said, on, at least two occasions, that if it had not been for James, she would not have had a shingle over her head. Finotti, without suggestion from any one but herself, he says, put the statement in the deed which she signed and solemnly acknowledged. In view of his long service and its character, it was natural the mother should desire to give, and should give some substantial recognition of it, and return for it. Not to have done so, would have been unnatural and unjust.

4. The strong preponderance of proof would establish the entire capacity of the grantor at the time of the execution of the deed to make it. Neither her mind or body was as much enfeebled as the complainants charge in their bill. Those who saw most of her are very decided in their opinions of her smartness and business capacity. The witness Finotti says that she gave him full directions as to the deed, its consideration and the description of the property she intended to be included in the deed. She pointed out to him the boundaries of the parcel of land she was directing to be deeded. Joshua Sheriff worked for her from 1858 to 1866, which includes the period when the deed was made. He had charge of the market garden, and generally paid its proceeds to her. He considered her a business woman. She generally attended to her business *herself ;* or if she was unable to do it, she *gave directions* about it. He says she was the principal banker. He thought her mind good, and never knew her to be irrational. He lived on the place for three years after

1866, and had no reason to think her mind not good. Charles and Kate Kerby, who lived with her, testify similarly. Mrs. Grony lived with her as a housekeeper after Kate Kerby left, and testifies she was a business woman. Louis Dyer, who knew her for many years, and attended part of the time to her market garden, speaks to same effect. The proceeds of the market garden were always paid over to her. Kate Kerby testifies to her having had a fall and an attack of paralysis about the same time; but says her mind was never affected but once, and then only for about twenty-four hours. She also says she directed her personally as to the housekeeping during her entire sickness. Mrs. Sheriff, who saw her often, and Mr. Clarke, who was a visitor, thought well of her mental capacity. The draftsman of the deed thought so well of it he says he often consulted her about his own business. Dr. Kerby says she was some times affected in cloudy weather, unpleasantly from the effects of her fall, but was not affected mentally, and was fully capable of executing a deed. There is no testimony whatever to the contrary, except the testimony of the complainants Hatton, and Bernard and Levi Kerby. Their testimony is vague and indefinite, and with few facts to base it on. Their opportunites of judging were by no means equal to those who were constantly around her, and having business communications with her. Bernard Kerby says he never saw her out of her mind *but once*, and that was after the attack of paralysis, and before the deed was executed. He must have seen her on the only occasion when she was so, for Kate Kerby, who was always with her, says, she was only so once, and that was after the fall, (which was about the time of the paralysis,) when she was mentally affected by the shock, twenty-four hours only. Miss Kate fixes the time with some accuracy and by facts calculated to impress it on the mind. She says it occurred in June or July, 1862. . She gives the facts on which she bases the state-

ment. Her grandmother was sick, and had the fall the next year after she came to live with her, and that was in 1861. Why it was in summer, she satisfactorily explains. The sickness to which the complainants allude, and the fall, which resulted in physical weakness and mental infirmity, as they charge in their bill, occurred in June or July, 1862. But this frailty of mind and body which incapacitated from attention to business did not continue long. She soon rallied, and continued to improve. It must have been so; for, in August, 1862, it is in proof that both Bernard and Levi Kerby had business transactions with her. On the 15th of August, 1862, we find both Bernard Kerby and Levi Kerby taking deeds for two parcels of land, each; each described by courses and distances; and each deed containing a *covenant of warranty*.

No matter if they were the consummation of contracts before that time made and not completed by deed; she must have had, at that time in their estimation, mind enough to take in and understand what she was doing, or they would not have risked their title upon instruments executed by her. They evidently acted, at that time, upon a different theory from that they now press. That action is very pregnant and potent, as bearing upon the question at issue. The deed assailed was not executed till February, 1864. According to the proof of the complainants she must have continued to improve in mental condition; for in December, 1867 they allege, that of her own motion, upon getting information of the character of the deed to James, she took steps to have the same set aside, and that she had a bill in equity prepared, sworn to and filed for that purpose. Mr. Brandt, the justice before whom the affidavit was taken, says in response to interrogatory from complainants, that at that time he regarded her as an intelligent and smart lady; that she was in as perfect mind as he had ever seen her; though

she was then in feeble health. She was then, according to the evidence, about seventy-six years old.

6. There is no evidence in the record of a single instance of persuasion on the part of James Kerby, or effort to exercise any influence whatever upon her. That it was exercised is surmised from the fact of supposed opportunity, and the likelihood of such services and attentions, as he rendered, making her susceptible to approach, and an easy victim, by reason of it. It does not appear that he ever made any demand even from his mother for compensation in that way, or that he even knew of the deed till it was made. Finotti says, he was not present and made no suggestion about it. Great stress is laid on the fact that Mrs. Edelen filed a bill to set aside the deed. The specific charges of that bill would not have been evidence *per se*, if she had prosecuted it in her life-time. Some proof would have been necessary. Slight proof might have sufficed, in view of their relations to each other as principal and agent. These charges in that bill are not evidence now. Considering that *act* however, as such, to throw discredit on the deed, it is counterbalanced by the voluntary withdrawal of the suit and dismissal of the bill by her own order, over her own signature. That dismissal was an abandonment of the charges, and an acquiescence in the deed. She so rested content for several years—till her death. That action is especially significant, as it was taken after a full knowledge of the true construction of the deed, which, it is proper to notice, that Mr. Dangerfield, her counsel, whom she consulted, and who prepared the bill, stated was the only thing she professed not to have understood; for he says she never denied executing the deed. It was dismissed after independent counsel from him as to her rights in the premises, and full explanation of the position in which she placed herself by the deed.

If the deed had originally been executed after such independent counsel, the case would have met the require-

ments of the strictest rule, which has ever been applied anywhere, by any authority, to gifts or purchases between principal and agent. We know of no rule which prevents a Court of equity from construing the act of the party, (after full knowledge of the character and effect of the paper executed, and competent and independent advice,) by which all claim to have it set aside is abandoned, into a re-affirmance of the paper. Certainly, the rule requiring prompt action by a party inveigled into a transaction not comprehended or intended, as soon as the fraud is discovered, applied to her. It is said, she took immediate steps upon that discovery. Conceding she did act with due promptness; that bill was dismissed upon her own order; and no other proceeding was ever instituted; notwithstanding she lived two years after the dismissal of the bill she did file, and four years after the discovery of the alleged improper action of James P. Kerby. The bill dismissed, goes for naught; and applying a liberal construction of the rule of promptness, proceedings were not begun in time to prevent an unfavorable inference from delay. The *laches* of the mother, under the circumstances, become the *laches* of the heirs. They can be in no better position than she was. Besides, this bill was not filed by the complainants for nine months after their mother's death, notwithstanding their knowledge of the facts as alleged, had been obtained in 1867. This also is a significant fact in the case. *Laches* have not been relied upon, and we do not put our decision thereon; but only advert to the facts, both in the case of the mother and of these complainants, as elements to be considered in making up judgment upon the main point. It is worthy of remark, in this connection, that this bill of Mrs. Edelen, to set aside the deed, was only resorted to after a great excitement had been gotten up among the other children, and a great onset upon her, in respect to it. It is also a singular fact, that when the bill was

filed, directions were given the clerk to issue no subpœna, and that none ever was issued in the cause. Why this was so, no proof exists or has been given; but it naturally excites a doubt whether the bill was intended to be actually prosecuted. It is also a significant fact in the case, that Mrs. Edelen did not discharge her son from her service, notwithstanding the allegations against him, of having fraudulently drawn her into a deed, which was not such as she desired to make, and had appropriated her funds to his own use, and rendered her no account of his stewardship. Still she retained him as before, and the general agency and management continued till her death. Such conduct does not comport with the truth of the assertions these complainants make against James P. Kerby. She must have ascertained that she had made a mistake in supposing her son had not fully accounted with her for the proceeds of the farm. That he did make returns to his mother is evident from the testimony of Miss Kate Kerby, who says she saw her father from time to time pay over the wheat money to her grandmother; and that her grandmother kept *all the money under her own lock and key*, she knows this because she was often sent to get money for her. But it is insisted in the bill that the order by which that bill was dismissed was not her order, and was not signed by her. There is no word of proof that it was not her signature, notwithstanding the complainants, if it were not so, could have testified that it was not her hand-writing. On the other hand the signature is established by competent evidence to be genuine. The complainants have also offered the declarations of James P. Kerby, that his mother had told him she had given directions for the suit be dismissed, and he was inquiring if it had been done. Dr. Kerby also testifies to hearing his mother talk with Mrs. Dangerfield about dismissing the suit. We cannot therefore do otherwise than regard the suit as properly

dismissed by Mrs. Edelen's own order. There is no evidence to impeach that act as not voluntary, and after full consideration. We concur with the Court below that no sufficient reason exists for setting aside this deed, because it was improperly or fraudulently procured from a grantor mentally incapable of executing it. In regard to the Judge's action in declaring the deed void, so far as the ten acre wood lot is concerned we do not feel called on to interfere. No appeal was taken from that part of the decree by the party suffering thereby. If the Court was not justified by the prayer of the bill in declaring the deed void in that respect and to that extent, in that proceeding; still the deed is so manifestly defective in the failure to sufficiently describe the ten acre lot, to enable the grantor to hold it against the claim of the appellants, that no good could result from disturbing the decree in that particular.

It only remains for us to pass upon the questions of evidence raised in the exceptions of both complainants and defendant. What we have said, in the course of the opinion upon the merits, and the proof on which we have relied, has already indicated the disposition we must make of the questions of evidence presented.

The first exception of the complainants to the testimony of Dr. John B. Kerby, because of his incompetency as a witness, by reason of his being a beneficiary under the deed cannot be sustained, and is overruled to that extent. He is certainly no party to the instrument, in that sense which the Act of Assembly requires, to make him incompetent; and his relation to the instrument does not disqualify him. His case is certainly covered by that of *Graves vs. Spedden,* 46 *Md.,* 527. Nor are we prepared to say that the same decision does not cover the case of James P. Kerby. We have found difficulty in distinguishing this case from that; but without deciding the question as to him, we have treated the case irrespective of

his testimony, and have nowhere referred to or included it; except in an isolated instance in which the complainants have chosen to put his declarations in evidence.

The second exception of complainants is sustained as to part and overruled in part. The rule is now well established, that a sufficient foundation must be laid for an opinion, and that non-experts cannot be permitted to .give it, without giving the facts and circumstances on which the opinion is based. *Waters vs. Waters and Wife*, 35 *Md.*, 531. This is to enable the jury or tribunal on whom devolves the duty of decision to judge of the value of the opinion expressed ; for if the opportunity of forming a judgment has not been good, the opinion will be of little or no value. Joshua Sheriff, Mrs. Sheriff, Charles Kerby, Henrietta Grony, Louis Dyer and Kate Kerby, enjoyed opportunities of the best character for judging of her condition; Of course, they were not medical experts, and could not say more than that she appeared in reasonable health or otherwise when they saw her. Of her mental condition they could only judge by their intercourse and observation. Mrs. Sheriff was in her employ, and paid money to her, and made settlements with her, and said she was the principal banker. Mrs. Sheriff saw her often, sometimes every day, Charles Kerby, Mrs. Grony and Kate Kerby were in her daily employ, they say, for given periods, and their opinions cannot be rejected under the rule. It is doubtful as to Mr. Dyer, though his opportunities and the circumstances are not so distinctly stated as to justify him in saying, whether she was capable of making a contract. Yet her apparent condition when he saw her was admissible. He does not state his having been in her service ; but another witness does. Mr. Clarke visited her, he says a dozen times a year, from that intercourse he speaks, and we cannot reject his opinion, though it may not be as valuable as that of others.

Kerby, *et al. vs.* Kerby and Kerby.

The exceptions to Finotti's testimony must be over-ruled. The admission, at bar, of the service of the inter-rogatories upon the counsel for the complainants, and his entry of his admission of service on the original, which was transmitted with the commission, we must regard as curing any technical objection to the testimony of this witness taken under the commission.

So far as the interrogatories are alleged to be leading, and therefore exceptionable, the objection comes too late. Such objections being only as to form, are always required to be made at the time propounded, in order to give a chance for correction into admissible form. *Smith vs. Cook,* 31 *Md.,* 174 ; *Jones, Adm'x vs. Jones,* 36 *Md.,* 447 ; *Shipley's Case,* 39 *Md.,* 257 ; (*Striker vs. Todd.*) 13 *Sergeant & Rawle,* 13 ; The objection should have been noted before the commissioner.

The first, second, fifth, sixth, eighth, twelfth, fifteenth, twenty-second, twenty-sixth and thirtieth exceptions, so far as they relate to conversations with Mrs. Edelen, im-peaching her deed are sustained. *Funk vs. Newcomer,* 10 *Md.,* 316 ; *Cooke vs. Cooke,* 29 *Md.,* 550 ; *Reese vs. Reese,* 41 *Md.; Dorsey vs. Gassaway,* 2 *H. & J.,* 402 ; *Owings vs. Lowe,* 5 *G. & J.,* 145.

As to the exceptions of the appellees, we do not deem it necessary to pass upon them. Inasmuch as upon such of the evidence in the behalf of the appellants, as we thought admissible upon the most liberal application of the rules of evidence, we have thought their case not made out, and decide in favor of the appellees, we have not thought it necessary to pass *seriatim* on the exceptions filed by the appellees. The decree will be affirmed with costs to appel-lees.

*Decree affirmed.*