EFFIE PERKINS, ET AL., *v.* PEARL W. JACKSON, ET AL.

[No. 146, October Term, 1946.]

618

*Decided June 11, 1947.*

*Joseph Loeffler,* with whom were *Isadore E. Levin* and *W. A. C. Hughes* on the brief, for the appellants.

*Z. Townsend Parks, Jr.,* with whom was *Howard C. Bregel* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

In 1926 Bertie Cameron and her husband acquired a house and lot known as 1013 W. Lafayette Avenue, Baltimore City, for which they paid $8,500. Simultaneously, they executed a purchase money mortgage on

.this property to the Chesapeake Mortgage Company of $5,000, and a second mortgage to the Beacon Permanent Building and Loan Association of $2,500. Her husband died, and she become the sole owner of the property. The house was a rather large three-story structure in a good colored neighborhood. She rented rooms in the house from the time she purchased it. She had been a servant for Mr. Howard M. Emmons, and worked for him for years.

In 1939 she improved the property. The second and third floors were converted into apartments. The first floor was not improved. She occupied the first floor herself. At that time she mortgaged the property for $2,600 to pay for the improvements. The money received from the mortgage was not sufficient to pay. for the improvements and Mr. Emmons advanced her $1,277.60. The costs of the improvements totaled $3,877.60.

For two and a half years Pearl W. Jackson rented an apartment from Bertie Cameron. She then moved to 1009 W. Lafayette Avenue, only two doors from the residence of Bertie Cameron. She was a school teacher and taught school at Carver Vocational Senior High School, Lafayette and Carrollton Avenues.

Bertie Cameron was not a business woman, and had spent most of her life working as a servant for Mr. Emmons. After she stopped working for him at his home she did laundry work for Mr. and Mrs. Emmons, and Mr. Emmons took the laundry to her and stopped to get it when it was finished, practically every week, until she became physically incapable of doing the work. He was very fond of her and advised and helped her. Mr. Emmons is a lawyer and for years has been vice-president of the Monumental Life Insurance Company.

As Bertie Cameron grew older, and for some years before her death, Pearl W. Jackson acted as her business agent She collected the rents from the apartments and looked after her affairs generally. Bertie Cameron died in her apartment on January 27, 1943,

intestate. She had two sisters living, one Effie Perkins, who was married and at the time of her sister's death occupied one of the apartments at 1013 W. Lafayette Avenue, with her husband; and Daisy O. Wilson, who was married and living with her husband on Pierce Street, Baltimore City. When Bertie Cameron died Effie Perkins was notified immediately, and in turn Daisy Wilson and Mr. Emmons.

They all met on the day Bertie Cameron died, in her apartment, and Pearl W. Jackson was there. Mr. Emmons, of course, knew all three of these colored women. The two sisters of Bertie Cameron were totally unfit to administer on her estate, as they were without business experience, with no connection whatsoever with legal affairs. They were house servants. Pearl W. Jackson was an educated woman, teaching in one of the best colored schools in the city, had acted as agent and collected the rents and looked after the property for Bertie Cameron in her lifetime, and Mr. Emmons suggested to the two sisters that they did not know how to conduct the administration of Bertie Cameron's estate, and Pearl W. Jackson was suggested for that office. This was on the evening of Bertie Cameron's death. Mr. Emmons told the sisters that nothing should be moved from Bertie Cameron's apartment. The sisters agreed that it would be best that Pearl W. Jackson be appointed administratrix, and sometime in February the two sisters, together with Wayman Widgins, renounced their right to administer upon the estate, and suggested that Pearl W. Jackson be appointed administratrix of the estate of Bertie Cameron. The Orphans' Court appointed her administratrix, and she qualified by filing a bond. The two sisters evidently wanted Mr. Emmons, who had known them for years, to advise the administratrix in the administration of the estate. Mr. Emmons is an elderly gentleman and did not want to act as advisor, and suggested Mr. Howard Calvert Bregel. Accordingly, he called Mr.

Bregel and told him he was turning the matter over to him for legal direction.

Pearl W. Jackson called on Mr. Bregel. She did not known him before Mr. Emmons directed her to him, and on her first visit to Mr. Bregel she advised him that these sisters, elderly colored women, agreed to sell her all their right, title and interest in this fee simple property, of which Bertie Cameron died seized and possessed, each sister to receive as consideration therefor the sum of $200. From that time on Mr. Bregel acted as counsel for Pearl W. Jackson in the purchase of this property. His associate, Mr. Z. Townsend Parks, Jr., acted as counsel for Pearl W. Jackson, Administratrix, and, other than seeing her at his office, Bregel had nothing to do with advising Pearl W. Jackson in administering the estate of Bertie Cameron.

The first thing that Bregel did in the matter was to send out identical letters, dated February 25, 1943, to Effie Perkins and Daisy O. Wilson. These letters are as follows:

"You are probably aware that the property left by Mrs. Cameron is subject to a mortgage in Calvert Bank, and many other current expenses, which, due to the low income derived from the rental of same, would be in default if it were not for the fact that Miss Jackson has been contributing for many years, the necessary assistance to keep the property running, and not be sold at forced sale.

"Inasmuch as it will take several months to settle this matter, it will be again necessary for monies to be advanced to keep this property intact, and I am informed that you would dispose of your interest in the property at this time for the sum of $200.00, instead of advancing the necessary monies as would be necessary to do.

"I will call on you sometime within the next few days to present you with the check for the sum of $200.00, and will present you with the necessary Assignment for your execution.

"Before I go to this trouble, will you please indicate at the bottom of this letter and return to me in the self-addressed envelope, which is enclosed, so that I will be assured that this is your understanding. Very truly yours, Howard C. Bregel." (signed)

At the bottom of this letter is the following: "I hereby agree to accept the sum of $200.00 for my interest in the estate of Bertie Cameron as above set forth."

In the letter addressed to Effie Perkins this was signed, Effie Perkins, and the one addressed to Daisy O. Wilson was signed, Daisy O. Wilson. These two letters were exhibited with the answer to the bill of complaint. Also exhibited with the answer is the following:

"I, the undersigned, being one of the heirs of Bertie Cameron, deceased, in consideration of the sum of Two Hundred Dollars $200.00, in hand to me paid, the receipt whereof is hereby acknowledged, do hereby grant, convey, assign, transfer, release, and set-over unto Pearl Jackson, all my right, title and interest in and to said estate of Bertie Cameron, deceased, and especially and including property known as No. 1013 W. Lafayette Avenue.

"As Witness my hand and seal this 4th day of March in the year nineteen hundred and forty-three.

Signed    Effie Perkins (seal)"

This instrument was acknowledged on the 4th day of March, 1943, by Effie Perkins before C. Marcellus Dorsey, Notary Public. An identical instrument was signed by Daisy O. Wilson, and acknowledged on the 4th day of March, 1943, before the same Notary Public.

On the 8th day of June, 1943, a deed was executed by Ulysses Widgins and Wayman Widgins, unmarried, of the City of Philadelphia, State of Pennsylvania, and Effie Perkins and Daisy O. Wilson, unmarried, of the City of Baltimore, to Pearl W. Jackson, whereby they "in consideration of the sum of Five Dollars and other good and valuable considerations" granted and conveyed unto Pearl W. Jackson, her heirs and assigns, in fee

simple, all their right, title and interest in and to the property aforesaid, of which Bertie Cameron died seized and possessed. All of these papers relating to this property transfer were prepared by Mr. Bregel. On the 14th day of July, 1944, Pearl W. Jackson granted and conveyed this property to her mother, Georgia V. Walker, unmarried, the consideration being "Five Dollars and other good and valuable considerations." On the same day, to wit, the 14th day of July, 1944, Georgia V. Walker, unmarried, conveyed this property to Pearl W. Jackson. The *habendum* clause in that deed is as follows:

"To Have And To Hold the said lot of ground and premises above described and mentioned and hereby intended to be conveyed together with the rights privileges appurtenances and advantages thereto belonging or appertaining unto and to the proper use and benefit of the said Pearl W. Jackson for and during the term of her natural life with full power in the meantime to sell mortgage lease limit convey or in any other manner dispose of the absolute estate in said property without the consent or joinder of anyone and from and after her death in the event said powers are not exercised then to Sophronia Stewart Griffin her heirs and assigns in fee simple."

Wayman Widgins and Ulysses Widgins appear to be sons of a deceased brother of Bertie Cameron, Thomas W. Widgins. In the bill of complaint, however, it is stated that these two men were the natural children of Thomas Widgins, by a woman named Mary Jane Wise, to whom Thomas Widgins was never married, and that they are not heirs at law of Bertie Cameron. The chancellor, however, did not go into the question of pedigree.

The following was agreed to by counsel for the respective parties: That the property, 1013 W. Lafayette Avenue, was in fee simple and subject to a mortgage to the Calvert Bank, in the sum of $1,500 at the time of the death of Bertie Cameron; that the deceased owned

a share of stock of the American Telephone and Telegraph Company, also five electric refrigerators which were omitted from the inventory and not administered on in the Orphans' Court; that on November 10th the administratrix filed an inventory of the personal property showing as the sole personal estate, one share of American Telephone and Telegraph Company stock, appraised at $154; that the inventory of real estate filed by the administratrix showed as the sole estate in fee simple the property No. 1013 W. Lafayette Avenue, appraised at $3,000; that the administratrix filed in the Orphans' Court an inventory of debts, showing that the decedent owed the sum of $1,500 to the Calvert Bank, secured by a mortgage on the real estate at No. 1013 W. Lafayette Avenue.

At the time of the death of Bertie Cameron she occupied the first floor of No. 1013 W. Lafayette Avenue, as her own apartment. The weekly rents from the apartments on the second and third floors, together with the rents from a garage, amounted to $41.25, which Pearl W. Jackson had been collecting for some time prior to the death of the decedent and applying to the expenses and upkeep. This she continued to do after the death of the decedent.

Sometimes after the deed of the property was made to Pearl W. Jackson, Daisy O. Wilson was told that she and her sister had no interest in the property and would not participate in the profits from the same. The bill in this case was then filed. It states what has been narrated, together with other matters which we need not detail. It prays:

1. That the deeds mentioned be canceled and annulled.

2. That Ulysses Widgins and Wayman Widgins may be adjudged to have acquired no interest in the real and personal property of Bertie Cameron, and that the conveyance by them be declared null and void.

3. That the agreements and subsequent assignments be vacated, annulled and set aside.

4. That Pearl W. Jackson account for the rents received by her from the premises 1013 W. Lafayette Avenue.

5. That a receiver be appointed to collect the rents and manage the property.

6. That Pearl W. Jackson be required to account for the refrigerators, household goods and effects and other assets belonging to the estate of Bertie Cameron, deceased, not inventoried or accounted for by her in her administration account in the Orphans' Court.

7. That a receiver be appointed to take care of the personal estate of Bertie Cameron, deceased, which has not been administered on, and complete the administration thereof.

8. That an injunction issue restraining Pearl W. Jackson from disposing of any unadministered personal estate of Bertie Cameron, deceased, or in anywise to dispose of or encumber the premises 1013 W. Lafayette Avenue.

9. And for further relief.

To this bill answer was filed by Pearl W. Jackson, in which she denies the material allegations, and sets up that the deed of the sisters to her of their interest in the property was fair and equitable.

Sophronia Stewart Griffin answered the bill, and says she is a mere nominal party and acquires no interest whatever in the property in question until after the death of Pearl W. Jackson.

The case was heard in open court and consumed some two or three days in the taking of testimony. At the conclusion of the case the chancellor decreed:

"It is this 20th day of November, ordered by the Circuit Court of Baltimore City that the bill of complaint be and the same is hereby dismissed.

"And it is further ordered, that Effie Perkins and Daisy Wilson account to the administratrix of the estate of Bertie Cameron for the personal property of said decedent taken by them, and that Pearl W. Jackson, administratrix account in the Orphans' Court of Balti-

more City for the five electric refrigerators which were not inventoried in said Court.

"And * * * that the Defendants pay the costs of these proceedings."

From this decree the case comes here.

It is clear that Bertie Cameron and her husband purchased this property in 1926 for $8,500, and the money was raised to purchase the same by two mortgages totaling $7,500; that these mortgages were paid, and at the time of Bertie Cameron's death there was a mortgage of only $1,500 on the property. It is not shown that she or her husband came into possession of any money or property by inheritance. The inference is that the reduction of the $7,500 debt existing when they purchased the property was from what they saved by their frugality, and rentals from the property. There were debts, which we will refer to.

Pearl W. Jackson was asked: "Q. There has been some question about you taking papers, etc.—things of that kind. Will you tell us about that? A. I only had papers of her debts. I looked after Mrs. Cameron's affairs. Naturally she would have had the papers." She found two life insurance policies. They totaled in amount $280. She was named as beneficiary in the policies. She was asked: "Wasn't that done for the purpose of paying the funeral expenses? A. Exactly, and I did that." And she said the funeral expenses were $300 and she added $20 to the $280 received from the life insurance, in payment of the funeral bill. She testified that upon Bertie Cameron's death, Mr. Emmons was called immediately. He came and saw the two sisters and herself and a man and his wife, who were cousins of the deceased. "Mrs. Perkins and her sister suggested that I carry on the legal business as I had heretofore. It was agreed upon by the sisters and Mr. Emmons that he would draw up the necessary papers—." She said that Mr. Emmons knew the two nephews in Philadelphia, whom she had never seen, and he stated that all four people would have to be included to get the

estate in proper legal shape. Effie Perkins at that time objected to bringing in the two nephews, and said they were born out of wedlock. Thereafter Mr. Emmons made a second visit and the whole matter was discussed as to the property—that this was either the night that Bertie Cameron died, or the next night, and thereafter stated that the second visit of Mr. Emmons took place probably a week after the funeral. All the people who were present at Mr. Emmons' first visit were present on his second visit. He brought the necessary renunciation paper and had it signed, and stated that he was sorry that he could not attend to the matter because of failing health, and referred them to Mr. Bregel, who would handle the estate. She stated that they discussed "how much was owing on the property, how the property stood, and the necessary information that any persons concerned about the property should know" and that the two sisters said "they felt that they would like me to have the property, and Mr. Emmons said that it would have to be carried through legal procedures. To make a statement was not enough." "They (the two sisters) decided that they would take a sum for the property, for their share, asking me to give $200.00"; that both Effie Perkins and Daisy Wilson made the suggestion that she give them $200 for their interest in the property. Mr. Emmons was present all the time and that concluded the meeting. She further said that at that meeting "Mr. Emmons said the Widgins boys would have to be considered, so that was understood that they would have to have their share," which was $200 each. She was asked how the figure of $200 was arrived at, and she answered "I don't know. That was their (meaning the sisters') suggestion." There was no discussion of whether $200 which the sisters were to get for their interest in the property was too little or too much.

After this testimony her recollection seems to have been refreshed. "Q. Was there any discussion, I believe you said, one time about the amount of a mortgage and other things? Was that at that meeting too? A. Oh, yes,

all of that was taken care of at that meeting, the amount of the mortgage due. The mortgage was $2600.00 and the balance was $1500.00 that is, at the time of the death of Mrs. Cameron." That this all occurred in the presence of Mr. Emmons at the second meeting with him. She said the discussion of the mortgage was made at the end of the meeting "and when all the bills were laid out. The books there were put on the table and given to Mr. Emmons and Mrs. Perkins and Mrs. Daisy Wilson." One of the bills was a note to Mr. Emmons for $400, and this money was used to exterminate termites. There was a bill of $800 due the General Contracting Company, who held a contract to put a new roof on the house, and a receipt of $100 having been paid by the deceased. This contract, however, was terminated and the $100 that had been paid to the General Contracting Company by the deceased was returned to Pearl W. Jackson, as administratrix. After mentioning the mortgage again, she testified: "I think they were the most outstanding bills." (That is, the mortgage, the note of $400 to Mr. Emmons, and the $800 to the General Contracting Company.) "There may have been some small bills. There was a doctor's bill to be paid." She mentioned the funeral bill of $300, $280 of which was paid by life insurance taken out by the decedent for the purpose of her burial. There were taxes to be paid. She then produced a list of bills which she claimed to have paid. She further stated that all current bills were talked about at this meeting and that Mr. Emmons was in charge of the discussion because he wanted to know something about it. "Q. Was it after that or before you discussed those things that this figure was mentioned of $200.00? A. The $200.00 was mentioned after the sisters listened to what I had said and what Mr. Emmons said about the property, how the property stood, then they mentioned the $200.00." She further testified that after this full discussion "then Mr. Emmons had suggested to them that they see Mr. Bregel, everyone concerned should see Mr. Bregel." This testimony of Pearl W.

Jackson is not impressive, nor does it bear the quality of sincereness. She first stated that these old women, without any discussion at all, offered to sell their interest in this property for $400. Then, after questioning by her counsel, she details this long discussion. Her testimony is conflicting, and it is not the kind of testimony that carries conviction. These two sisters, as well as other witnesses, deny this testimony.

Mr. Emmons testified that he went there on the first visit and told the sisters that everything in the house was to be taken care of and nothing in the house was to be taken away or disposed of until the administrator was appointed. He had known the sisters a long time, and had known the decedent for thirty or thirty-five years. He had known Pearl W. Jackson for several years before the death of Bertie Cameron. On the second visit Pearl Jackson was there and he thinks both sisters were there. He had with him a blank form of renunciation of the right to administer, and "I felt neither of the sisters were competent to take charge of the property or administer the estate, and suggested to them that I thought Pearl Jackson was the proper person to assume the charge of it." He witnessed the signatures of Effie Perkins and Daisy Wilson to their renunciation to administer on the estate of their sister. He was asked: "Q. Do you recall any conversation you had with Daisy Wilson and Effie Perkins about the financial affairs of the mortgages against the house, or other debts that were against the property? A. I told them what I knew about those things, and I knew it would require some very good handling to pull the thing out of the hole. There was a mortgage on the property. The basement was in very bad condition due to termites, which created considerable damage there and cost something over $400.00 to have remedied. There was an amount due me. I had advanced to Bertie Cameron—if you will permit me to look at my paper here on the subject—amounting to $1,277.60, which was the excess of a contract price for making the

changes into apartments on the second and third floors, less $2,600 which Bertie Cameron had furnished for that purpose. She obtained a mortgage of $2600.00, of which she received $2,551.75, being the amount of the mortgage less expenses, and she herself paid me that $48.25 to make up the $2,600.00. The entire cost of the improvements was $3,877.60. By crediting the amount of the mortgage which Bertie Cameron turned over to me, there was the amount of $1,277.60 as above referred to as having been paid by me in excess of what I received." Mr. Emmons was asked by the chancellor: "Do you remember any conversation with regard to Pearl Jackson taking the house over, or any basis on which she should take it over?" The witness: "I do not. I have read her testimony in which she said the question of the amount of $200.00 was discussed at that second meeting. To my recollection it was not. My first real recollection of it—the first I heard of it was when Mr. Bregel called me up over the 'phone, and stated she had made arrangements to pay them $200.00 apiece, and these other people in Philadelphia. That is the best of my recollection the first I knew of it. I did not want to be bothered with it. That is why I turned it over." The witness: "My sole purpose at that time was to have an administrator appointed to take charge of the property to take care of it and conserve it. That was my first and only thought. So far as subsequent details are concerned, it was up to Mr. Bregel to handle and I did not handle them. I thought he was competent to do it, and still think so." In answer to the chancellor's question, Mr. Emmons stated: "There was so much indebtedness against the property that must be met, and so many repairs that should be made which would perhaps be justified from current receipts, and I felt there should be some one who could independently like I had done for Bertie, if necessary, advance money to make those necessary repairs to make the property more productive. I did not think so then and do not think so

now that either one of those two sisters were competent to take charge of the matter."

These sisters say that when the $200 was paid to them it was represented by Pearl W. Jackson as having to do with the administration of their sister's estate and that they signed and acknowledged the papers sent to them by Mr. Bregel under this misapprehension. Effie Perkins says that she can read, but there is some doubt about this, and there is a suggestion to be gathered by the evidence that she wanted to hide the fact that she could not read. Daisy O. Wilson could read, but did not read the papers that were prepared by Mr. Bregel, because she thought that the matter had something to do with the administration of her sister's estate.

The notary before whom at least two of these papers were acknowledged says in one part of his testimony that he read the papers to them, before they acknowledged them. But he stated later in his testimony that he wouldn't recognize either of the sisters, and that it was his usual custom to read papers to persons executing them before he took the acknowledgment. Both of the sisters stated that he did not read the papers to them; that Pearl Jackson took them to the notary and paid the notary his fee, and that they were simply called up and told to sign. Effie Perkins stated that on their way home from the office of the notary she said: " 'Pearl, you remember now we are not selling you this property because you are not able to buy it.' She said, 'No, I know I am not,' and there was not another word said." Pearl Jackson was asked: "Q. There has been some testimony by the complainants that on the way home from the notary you stopped on a certain corner and had a discussion. Do you recall anything of that kind? A. I don't recall any discussion at all. Q. Would you say that it did, or did not, happen? A. It did not happen to my knowledge. I don't remember anything they said concerning the papers at all." Pearl Jackson does not contradict Effie Perkins as to this conversation,

but her testimony in regard to it is uncertain and far from contradicting Effie Perkins. Pearl Jackson, in her testimony, repeatedly said that these sisters had complete confidence in her. Effie Perkins stated: "I asked her to look after the mortgage, asked her to collect the rent and pay the mortgage off, because she had been paying it for my sister, and I asked her would she continue to help us out while I was in trouble." She further testified that after her sister's death she paid the rent for her apartment to Pearl W. Jackson, as it was her desire to pay off the mortgage and debts on the place before she discontinued paying rent for her apartment.

We do not think it necessary to further detail the testimony in this case. The evidence shows that these two sisters were house servants and entirely without business experience. They were close friends of Pearl W. Jackson, who in turn was on intimate terms with the deceased. During the lifetime of the deceased, Pearl W. Jackson acted as her agent to collect the rents, pay the bills incident to this apartment house, the interest on the mortgage, the taxes and insurance, and the balance was turned over to the deceased. Upon the death of Bertie Cameron the sisters turned to Pearl W. Jackson as a close friend, and as one who knew all about the affairs of the deceased. They wanted her to continue to manage the property, and when the debts were paid off from the rents, as they thought could be done, they would have the property for a home and an investment. Accordingly they made her administratrix of the estate. We cannot base our decision in this case on the testimony of Pearl Jackson, which stands alone. What she told her attorney, Mr. Bregel, and what he said in his letter to these sisters, regarding the property, is what Pearl W. Jackson told him. He never looked at the property. Apparently he never inquired about the rents of the apartments which brought in a weekly sum of $41.25. He did not know of the condition of the house and the kind or nature of repairs that it needed. The testimony in this case, to support the contention

of the appellee that these sisters suggested to her that she pay each of them $200, and they would sell to her all of their interest in the property, is the testimony alone of Pearl W. Jackson.

The contention that the sale of the interest of these sisters in this property to Pearl W. Jackson was fair, we cannot accept. There were several valuations, as of 1943, placed upon this property by real estate experts, and the chancellor below struck an average from the values placed on the property by these experts, and found that the property was worth $6,300. He added up the following items:

| | |
|---|---|
| "Mortgage on property | $1500.00 |
| Termite bill | 400.00 |
| For a roof | 700.00 |
| Taxes | 20.00 |
| Bills against the estate | 1280.00 |
| Repairs since the death of Bertie Cameron | 1800.00 |
| Total | $5700.00 |
| Payments to Effie Perkins, Daisy Wilson and the Widgins boys | 900.00 |
| Total | $6600.00" |

He concluded that the property was worth $6,300, debts $6,600, therefore $200 to Effie Perkins and $200 to Daisy Wilson was a fair price for their interest in the property, and that the sale was a fair one. With this we do not agree.

The only debts that stood against this property at the time of the death of Bertie Cameron were: The $1,500 mortgage, $400 note due Mr. Emmons, and $20 taxes, which amount to $1,920. As we have said before, at the time of the decedent's death there was an outstanding contract with the General Contracting Company to put a roof on this house for $800, of which $100 was paid. This contract was canceled and the General Contracting Company returned the $100 which it had received to

the administratrix. Mr. Emmons had advanced to the deceased, at the time she improved the property in 1939, $1,280, or, to be exact, $1,277.60. He did not file this claim against the estate. He concluded that he would not press this bill against the two sisters. Certainly a claim that had been forgiven and never filed in the Orphans' Court cannot be credited to Pearl W. Jackson as a part payment for this property. Pearl Jackson proceeded to improve this property after she obtained the deed. She moved into the apartment on the first floor after the property was deeded to her, and she and her mother seem to have occupied this property ever since. There was testimony in the case that this apartment should have rented for $15 a week. She states she spent $1,800 in making improvements to the property, but this claim is not itemized.

This property was purchased in 1926 for $8,500, and in 1939 $3,877.60 was spent on improvements. It is common knowledge that property values in Baltimore City advanced between 1939 and 1943. If we value the property at $6,300 at the time of Bertie Cameron's death, as the chancellor did, and deduct the $1,500 mortgage, the $400 note to Mr. Emmons, and the taxes of $20, which total $1,920, there was an equity in this property, at the time of Bertie Cameron's death, of at least $4,380. The two sisters took, as heirs, at least two-thirds of this equity, which they sold to Pearl W. Jackson for $400. The sisters sold to Pearl W. Jackson their equity in this property, amounting at least to $2,920, for $400. This was not a fair sale.

At the time of the sale by the sisters of their interest in this property to Pearl W. Jackson, she occupied a confidential relation to the sisters with reference to this property. In *Brooke v. Berry*, 2 Gill 83, side page 99 and 100, Judge Dorsey quoted Justice Story's Commentaries on Equity, which, in part, is as follows: "It is, therefore, for the common security of all mankind, that gifts procured by agents, and purchases made by them from their principals, should be scrutinized with

a close and vigilant suspicion. And indeed considering the abuses which may attend any dealings of this sort between principals and agents, a doubt has been expressed, whether it would not have been wiser for the law in all cases to have prohibited them, since there must always be a conflict between duty and interest on such occasions. Be this as it may, it is very certain that agents are not permitted" "to deal validly with their principals in any cases, except where there is the most entire good faith, and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage or imposition."

The court goes on to say: "If these principles of Justice Story be correct when applied to dealings between principal and agent, where the mind of the principal is exempt from all imputation of imbecility, what must be their influence when applied to a case like that now before this Court."

In *Kerby v. Kerby*, 57 Md. 345, side page, 350, Judge Irving said: "By the admissions of the appellee, James P. Kerby, it is clear that he stood in that attitude and relation to Mrs. Edelen, as her general agent, which requires this deed from her to him to be scrutinized most closely, and with suspicion. It is immaterial whether it is to be regarded as a gift or as a deed for valuable services rendered; the relation he bore to her, was one of such confidence and trust, that the law regards the deed as *prima facie*, tainted with undue influence and fraud; and throws on the grantee the *onus* of showing it to be the free and uninfluenced act of the grantor, upon full knowledge of all the circumstances connected with it and of its contents."

In *Colburn v. Ellers*, 160 Md. 104, at page 111, 153 A. 14, 17, Judge Offutt said: "In dealing with that question it may be assumed that Mrs. Ellers stood in a confidential relation to her father, *Upman v. Thomey*, 145 Md. [347,] 360, 125 A. 860, and that she carried the burden of showing by satisfactory evidence that the

transaction was fair, voluntary, and free from any taint of fraud, coercion * * *."

In *Chase v. Gray,* 134 Md. 619, at page 623, 107 A. 537, 538, Judge Burke quoted 2 Pom. Eq., sec. 956, as follows: "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic, or merely personal."

In *Gerson v. Gerson,* 179 Md. 171, at page 180, 20 A. 2d 567, 571, Judge Johnson said: "It is unnecessary to prolong this opinion by considering the questions of actual fraud and forgery, and we rest our consideration of the case upon the finding that inasmuch as Mrs. Gerson imposed confidence and trust in appellees and their cousin in the transactions referred to, that she was wholly illiterate and without independent advice, they occupied a confidential and fiduciary relation toward her which has placed upon them the burden of proving the fairness and justice of the entire transaction, * * *." See *Gaggers v. Gibson,* 180 Md. 609, 26 A. 2d 395; *Grimes v. Grimes,* 184 Md. 59, at page 63, 40 A. 2d 58; *Green v. Michael,* 183 Md. 76, at page 84, 36 A. 2d 923.

We think that the administration of the personal estate of the decedent should be assumed by the chancellor below, and all matters relating to the estate be concluded in this proceeding. There has been no satisfactory account of the personal estate in the Orphans' Court, and this could be done under the jurisdiction of the chancellor. *Alexander v. Leakin,* 72 Md. 199, 19 A. 532; *Boland v. Ash,* 145 Md. 465, 125 A. 801.

The two cases cited by appellees have no application as they do not involve the question of confidential rela-

tion, which governs this case.

What furniture the deceased left, and its value, has never been accounted for, whether it be of substantial or trifling value. The sisters say that they divided the furniture, and some of it they gave to Pearl W. Jackson, the administratrix. There should be an accounting by Pearl W. Jackson for receipts of rents from this property and disbursements made on account of the property. She should be allowed for the payment of the mortgage of $1,500 and for taxes and insurance, for betterments she made to the property since she acquired the deed, to the extent they have enhanced the rental value of the property, not to exceed the costs of the betterments, and she should be allowed for the $200 which she paid to each of the sisters. She should be required to convey all her right, title, and interest in the property to the appellants; or a trustee should be appointed for that purpose. If she is able to establish that the Widgins brothers are legitimate sons of Thomas Widgins, a deceased brother of Bertie Cameron, then she should be allowed the sum of $500 which she paid for their interest.

The decree of the chancellor must be reversed. There is no necessity to appoint two receivers, one to collect the rents and manage the property, and one to manage the personal estate of the decedent. One receiver can manage both matters.

> *Decree reversed and case remanded for proceedings in conformity with this opinion, with costs to appellants.*

## On Motion for Modification

The motion for modification filed in this case is based upon the statement in the opinion that the appellee, Jackson, should be required to convey to the appellants the interest, if any, she received from the Widgins brothers. It is contended in the motion that this interest should not be affected when it was not under attack.

In cases of confidential relations, the fiduciary at fault is subject not only to restoration of property received as a result of direct transactions with the beneficiary, but also to accounting and payment to the beneficiary of profits realized from third parties by means of its confidential relationship existing with the beneficiary, or obtained from such third parties through dealings with respect to the subject matter of the confidential relationship.

The motion will be denied.