GRANTMYRE *v.* DARAGO ET AL.

[No. 53, October Term, 1950.]

Decided December 14, 1950.

*Louis R. Milio* and *Edwin S. Panetti* for the appellant.

*H. Beale Rollins* and *Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

The appellant filed her bill of complaint in the Circuit Court No. 2 of Baltimore City for the purpose of vacating and setting aside the deed made by her on May 27, 1947 to Albert A. Darago and Henrietta M. Darago, his wife, and Frank R. Lancelotta and Josephine M. Lancelotta, his wife, of the property No. 719 Mapleton Avenue in the city of Baltimore, and for further relief. The defendants' answer was filed, testimony was taken, and the chancellor, after a full hearing, dismissed the bill and the complainant appealed.

The facts shown by the evidence are that by the death of her husband on April 21, 1947, appellant was left a widow with twin daughters, then thirteen years of age. Within a period of ten years prior to that time, she had suffered the loss of a number of her close relatives. A sister died in 1938; a brother died in 1942; another sister died in 1943; a brother died in 1945, and another sister in 1947. After the death of her husband, she determined to sell the property in which she lived, which was a brick dwelling. The building next door was owned by the Erdman Lumber Company in which Mr. Darago and Mr. Lancelotta were partners. The Daragos were close personal friends of the appellant, and she had been intimate with them for years. She did not have the same relationship with the Lancelottas, but they were friends of the Daragos. Mr. Lancelotta had a one-third interest in the Caton Realty Company. Both the Daragos and other friends and relatives of Mrs. Grantmyre advised her not to sell her house, but she insisted and a For Sale

sign was put on the house by the Caton Realty Company within a week or ten days after the funeral of Mr. Grantmyre. No agency agreement was signed. Mr. Lancelotta testified that Mrs. Grantmyre urged the Erdman Lumber Company to buy the house because it was next door to their business. They said they were not in a position to make the purchase at that time, and, as a result of her insistence, the sign was placed upon the house. At that time, according to Mr. Lancelotta, she said she would like to obtain $4,000 for it. Shortly thereafter, according to Mr. Lancelotta, Mrs. Grantmyre called him and said she had a man in her house who wanted to buy it. He went to her house and there met the man, a Mr. Reisfeld, who said he was ready to buy the house, and Mrs. Grantmyre said: "He is going to pay me $4,500.00 for the house." Mr. Lancelotta said that he then said to Mrs. Grantmyre: "Mrs. Grantmyre, here is the whole thing, I'll tell you in his presence, it seems to me that he is here in an attempt to make a future sale to me on a hold-up basis. * * * Now, rather than he buy it for $4,500.00 now and come to me a year or two years later, and God knows what price he will ask for it, I'll tell you what I'll do; you may dismiss this gentleman and I will go out and get the money somehow or other." Mrs. Grantmyre then apparently dismissed Mr. Reisfeld as requested, and the appellees, after vainly attempting to get a loan from the Equitable Trust Company, got one from a personal friend, and bought the property for $4,500. This was about five weeks after the death of Mr. Grantmyre.

Mrs. Grantmyre testified that she was so upset and disturbed in her mind at the time that she did not know what she was doing, that she was not mentally competent, was without counsel, was not familiar with real estate transactions, and asked that the sale should be set aside on this basis. She professed to be unable to remember anything about the sale, and whenever asked about it, went into rambling statements about how she had been treated. She said that Mr. Lancelotta was

her real estate agent, that he purchased the property from her at a price less than should have been obtained for it, and had taken advantage of her when she was in great mental distress. The respondents have made alterations and changes in the house by way of incorporating it in their business property, so that it obviously is inequitable to require the sale to be rescinded, and the appellant therefore asks that relief be given her by way of money decree for such amount as may be found to have been the proper value of the property at the time of the sale.

There can be no question that in any proceeding in which a complainant alleges that she was not competent to execute a deed, the burden is upon her to show that at the time of the execution, she was not capable of making such a conveyance. The appellant, while attempting to make some claim that the burden of proof is otherwise, did present the testimony of two psychiatrists, Dr. Kerman and Dr. Spear. Dr. Kerman saw her first in December following the transaction and he said that he would not be able to give any opinion as to her competency in May, but he could only say that if she was in May as she was in December, then she was not competent to understand the nature of a deed. Dr. Spear had seen Mrs. Grantmyre in 1943, and at that time he said he thought she knew what she was doing, but she did not have sufficient capacity to control her intelligence. It appeared from the record that Mrs. Grantmyre had a great many doctors, but the testimony of a number of other people, not physicians, who saw her in May and talked to her, was to the effect that she knew perfectly well what she was doing, and that she insisted on selling her house although advised against it. Under these circumstances, we agree with the statement of the chancellor who said that it was clear to him that the weight of the evidence was that Mrs. Grantmyre was mentally competent at the time the transaction took place.

The second question involves the relationship of principal and agent, and the purchase by an agent from his principal. We find that the testimony shows that while Mrs. Grantmyre was competent to execute a valid deed in May, 1947, she was at that time under considerable strain, that she had no knowledge of business, that she insisted on leaving the premises where she had apparently had a happy life with her husband, and wanted to do it as quickly as possible. She was emotionally upset, but she was quite determined in her mind about this one thing. She was advised by the Daragos, who were her close friends, not to sell; she was advised by her brother not to sell; and she was advised by her neighbors not to sell, but she insisted. She went to Mr. Lancelotta, the friend and partner of her close friends, and asked him first to buy the property, and then, when he professed himself unable to buy it, she asked him to sell it for her. She evidently had trust and confidence in him, and, in accordance with her request, he, or his real estate firm, put a sign on the property. It does not appear that either he or the firm made any other effort to sell the property to anyone, but, on the contrary, the first time that anybody appeared to buy it, Mr. Lancelotta changed his position from that of an agent to that of a purchaser and determined to buy the property at all events in order to protect his next door lumber business. There was nothing wrong in his doing this, provided it was done with the full knowledge of the principal. *Blake v. Stump*, 73 Md. 160, 172, 20 A. 788, 10 L. R. A. 103; *Slagle v. Russell*, 114 Md. 418, 80 A. 164; *Wieghardt v. Wagner*, 140 Md. 188, 117 A. 330. Under such circumstances, however, he owed it to his principal to pay her, not necessarily the first offer which had been made for it, but what would be a reasonable and fair value for the property. He frankly disclosed to her why he was buying it as a matter of protection, and, in so doing, also disclosed that possibly in a year or two, he would be forced to pay more for it, but he did not tell her whether the $4,500 was a fair price or not, and he did not suggest

to her that she make an independent investigation to find out about the price. She apparently trusted him. No contract was signed, but after he and Mr. Darago had raised the money, a deed was executed by her. Dealings between principals and agents are closely scrutinized. Justice Story, in his Commentaries on Equity, says this should be done with "a close and vigilant suspicion", and intimates that it might have been wiser if the law in all cases had prohibited them. However, he concludes that agents are not permitted to deal validly with their principals in any cases "except where there is the most entire good faith and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage or imposition." *Brooke v. Berry,* 2 Gill 83; *Kerby v. Kerby,* 57 Md. 345; *Perkins v. Jackson,* 188 Md. 616, 53 A. 2d 678, 54 A. 2d 330.

Mr. Lancelotta bore a confidential relationship to Mrs. Grantmyre, and this now places upon him the burden of showing that the transaction was a fair one in all respects and that she received an adequate price for the property. *Upman v. Thomey,* 145 Md. 347, 125 A. 860; *Gerson v. Gerson,* 179 Md. 171, 20 A. 2d 567; *Rice v. Rice,* 184 Md. 403, 41 A. 2d 371; *Bass v. Smith,* 189 Md. 461, 470, 56 A. 2d 800. Since it is now too late to rescind the sale, the only question before us is whether the price paid represented the full value at the time of the sale. This brings us to a consideration of the testimony as to the value of the property.

The principal testimony on this point, offered on behalf of the appellees, is that given by Mr. Harry U. Riepe, Jr., a real estate operator and appraiser whose qualifications were admitted. He said that in connection with his work as appraiser for the City, he had, in 1942 or '43 or '44, appraised houses in the vicinity of Mapleton Avenue and Erdman Avenue. This appraisement was done for the City and the Federal government together at the time an overpass was built to carry Erdman Avenue over the Pulaski Highway and into the North Point Road. There were 45 or more parcels appraised

at that time. A considerable number of these properties were two-story row houses, very similar to the property 719 Mapleton Avenue which is the subject of this suit. He appraised 719 Mapleton Avenue the morning of the trial. He appraised it as of the date of the trial which was in April, 1950, as $5,000. He estimated its value as of May 27, 1947, as about $4,500 in fee. He said of the $4,500 he would assign about $1,020 to the land, and the balance to the improvement. He used a figure of $40 a front foot, but if the land were 150 feet deep instead of 100 feet deep, he would appraise it at $50 a front foot. The appellees also introduced the tax records for what they were worth. These showed that the land was valued in 1947 for $800 and improvements at $1,900. The lot of 719 Mapleton Avenue was about 25 feet 6 inches in front, with a depth of 100 feet. Mr. Riepe was not asked and did not testify about comparable sales of any specific property in the neighborhood.

Appellees also produced the testimony of Mr. J. Philip Knapp, attorney for Mr. Rabai, who made a loan of $3,750 to the appellees to enable them to purchase the property. Mr. Knapp inspected the property and said he thought the fair market value was about $3,600 and recommended a mortgage of not over $2,500, but his client instructed him to proceed with the mortgage because of friendship with Lancelotta.

The testimony on behalf of the appellant consists of sales of two other houses in the neighborhood. Mr. Reisfeld, an attorney and member of the Real Estate Board holding a real estate broker's license, had the property 721 Mapleton, next door to 719. He said he had never been inside 719, but he thought from the outside it was substantially the same kind of property as his. Both were row houses, side by side on the same side of the street. He sold 721 for $5,250, subject to a $69 ground rent which, capitalized, would be $1,150. This would make the purchase price in fee $6,400. He sold 721 at the best price he could get for it in the

early part of 1947, after advertising it and getting a number of people to look at it and make offers. He testified that a few months prior to the date of selling it, he bought it for $5,100 in fee. His sale was on a conditional contract with $1,000 down. Mrs. Loretta Bewig, in May, 1947, lived at 723 Mapleton Avenue. She bought this house in December, 1946, and paid $4,500 in fee for it. Her lot was 46 feet 6 inches by 150, and her house had six big rooms and a bath on one floor. She sold her house to the appellees in June of 1948, after putting $500 or $600 in improvements on it, and she received $5,500 in fee for it. There was also offered testimony of a Mrs. Wade who was second cook in a restaurant and had no knowledge of real estate values. She passed by No. 719 while she was taking her children for a walk, saw a sign on the front "For Sale", and knocked on the door. She said Mrs. Grantmyre seemed mixed up and did not know what she wanted for the property. She told her that $7,200 was the highest she could offer. She left her name and address, but never heard anything further until she found out that the place had been sold. Apart from the fact that evidence of an offer is not admissible to prove value, (*Western Union Tel. Co. v. Ring*, 102 Md. 677, 679, 62 A. 801; *Horner v. Beasley*, 105 Md. 193, 197, 65 A. 820), this last evidence does not seem to us to have any relation to the real value of the property.

The chancellor came to the conclusion on this testimony that the overwhelming weight was in favor of the conclusion that the price was not inadequate. The Bewig house, which was on a lot 21 feet wider and 50 feet deeper than the Grantmyre house, was sold to the appellees for $5,500. Appellees' witness, Mr. Riepe, said that $40 a front foot was the proper figure for land on Mapleton Avenue 100 feet deep, and $50 a front foot for land 150 feet deep. Based on his figures, the Grantmyre land would be worth $1,060 and the Bewig land $2,325, or a difference of $1,265. Yet the Bewig house was purchased for the same amount and was sold, after

$500 or $600 worth of improvements had been made, for only $1,000 more. The Reisfeld house was purchased for $5,100. Its subsequent sale at lease-hold on conditional sale contract by an experienced real estate operator is not, we think, as much evidence of its value as the price which Mr. Reisfeld paid for it.

We therefore find that as to the only two houses in the neighborhood of which a sale has recently been made, one was a larger house that was purchased for the same price, and was sold for a price which does not fully allow for the difference in the size of the lot, and does not take into account the improvements placed upon it. The other house was bought for $600 more, and this last transaction is the only one which gives any basis for a conclusion that the price paid Mrs. Grantmyre was too little. On the evidence about this one piece of property alone, we are unwilling to disturb the finding of the chancellor, and we therefore conclude that, although Mr. Lancelotta was in a confidential relationship to Mrs. Grantmyre, and that the burden is upon him to show that the sale was fair, he has properly met that burden.

We affirm the decree.

*Decree affirmed with costs.*